678 F.2d 453
 Howard E. PFEIFER
v.
JONES & LAUGHLIN STEEL CORPORATION, owner or owner pro hac
vice of Barges 1011, 1384, 1400, 1363, and others
in a fleet, Appellant.
 No. 81-1928.
 United States Court of Appeals,
Third Circuit.
 Argued March 18, 1982.
Decided April 16, 1982.
Rehearing Denied May 20, 1982.
Rehearing Opinion as Amended June 1, 1982.
 
 Robert W. Murdoch (argued), Jones, Gregg, Creehan & Gerace, Pittsburgh, Pa., for appellant.
 Jerome M. Libenson (argued), Baskin & Sears, P.C., Pittsburgh, Pa., for appellee.
 Before ALDISERT, VAN DUSEN and GARTH, Circuit Judges.
 OPINION OF THE COURT
 ALDISERT, Circuit Judge.
 
 
 1
 Jones & Laughlin Steel Corporation appeals from a judgment in favor of plaintiff Howard E. Pfeifer in a third-party negligence action under the Longshoremen's and Harbor Workers' Compensation Act. The major question presented is whether the district court erred in applying the "total offset method" as a federal rule of damages, wherein the discount factor used to reduce future earnings to present worth is presumed offset by future inflation. We find no error and affirm.
 
 I.
 
 2
 Pfeifer was employed by appellant Jones & Laughlin (J&L) as a landing helper on its coal barges. On January 13, 1978, he slipped and fell because of ice and snow that had accumulated on the gunnel of a barge on which he was working. He struck a barge rail and landed on his tailbone, and a heavy electric motor that he was carrying fell in his lap. He has not returned to work since the accident. He has been examined by a number of physicians, several of whom testified at the trial, and he has undergone extensive physical therapy.
 
 
 3
 The district court found that appellant was negligent and that its negligence was the proximate cause of Pfeifer's accident and resulting injury. It determined further that Pfeifer was completely disabled from the date of the accident until July 1, 1979, and that thereafter he was capable of doing "light work" and lifting weights of up to twenty-five pounds, but that he could not work on the river. Appellant has not offered Pfeifer a job of any type since his injury, and the parties have not discussed the availability of a light duty position.
 
 
 4
 Relying on our decisions in Griffith v. Wheeling-Pittsburgh Steel Corp., 610 F.2d 116 (3d Cir. 1979), vacated, 451 U.S. 965, 101 S.Ct. 2038, 68 L.Ed.2d 343 (1981), reinstated on remand, 657 F.2d 25 (3d Cir. 1981), petition for cert. filed, 50 U.S.L.W. 3377 (1981) (No. 81-826); and in Blair v. United States Steel Corp., 444 F.2d 1390 (3d Cir. 1971) (per curiam), cert. denied, 404 U.S. 1018, 92 S.Ct. 681, 30 L.Ed.2d 666 (1972), the district court determined that as a vessel owner pro hac vice, appellant was liable for negligence under § 5(b) of the Longshoremen's and Harbor Worker's Compensation Act (LHWCA), 33 U.S.C. § 905(b). In measuring damages, it declined to consider future wage increases or to discount the award to present value, citing Kaczkowski v. Bolubasz, 491 Pa. 561, 421 A.2d 1027 (1980). The court multiplied Pfeifer's 1978 annual wage by his work life expectancy, deducted the amount of compensation Pfeifer had received under LHWCA, and subtracted his projected earnings at minimum wage from July 1, 1979, until his sixty-fifth birthday, taking judicial notice that the federal minimum wage at the time of the accident was $2.90 per hour.
 
 
 5
 On appeal, J&L does not challenge the district court's findings that it was negligent and that its negligence was the proximate cause of Pfeifer's injury, nor does it contend that it was not correctly found to be an owner pro hac vice under the standards set forth in Blair, 444 F.2d at 1391. It argues, however, that because Pfeifer was its employee he does not have a cause of action for negligence under § 5(b) of LHWCA. It argues also that the district court erred in applying the Pennsylvania damages test of Kaczkowski, and further in factoring damages on the basis of the minimum wage rate instead of wages for light duty.
 
 II.
 
 6
 We quickly dispose of appellant's argument that the district court erred in allowing Pfeifer to proceed in a negligence action against his own employer under § 5(b) of LHWCA. J&L reads § 5(a) as an absolute limitation on a longshoreman's right to sue his employer under § 5(b): unless the employer has failed to secure payment of compensation as required by § 4 of LHWCA, 33 U.S.C. § 904, it cannot be held liable as a third party under § 5(b). We carefully considered the identical argument in light of the 1972 LHWCA amendments in Griffith v. Wheeling-Pittsburgh Steel Corp., 521 F.2d 31, 38-44 (3d Cir. 1975), cert. denied, 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976) (Griffith I); and we concluded that we remain bound by the Supreme Court's decision in Reed v. The Yaka, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963), which held that § 5(a) (then § 5) does not bar a suit against an owner pro hac vice who also is an employer liable for compensation. Griffith I requires us to reject J&L's argument in this case.
 
 III.
 
 7
 Appellant next argues that the district court erred in its calculation of damages by applying the rule announced in Kaczkowski v. Bolubasz, 491 Pa. 561, 421 A.2d 1027 (1980). It contends that damages in an LHWCA case must be computed according to a uniform federal standard; and that federal law requires that a lump sum award for lost future earnings be reduced to present value, a practice effectively abolished in Pennsylvania by the decision in Kaczkowski. To meet this contention, we must explore the developing law of damages in state and federal decisions in light of controlling legal precepts and prevailing economic conditions.
 
 A.
 
 8
 But first we must make the preliminary determination of what precise aspect of the damage issue has been preserved for appeal. Our examination of the record persuades us that appellant has not preserved for review its contention that the court erred in applying Pennsylvania law because it felt obliged to apply state law, rather than federal law. It was the plaintiff's position at trial that federal law controlled damages and that inflation was a valid consideration under federal law. Appellant did not seem to challenge this position except to suggest that evidence of inflation had to be introduced by expert testimony and that future earnings had to be reduced to present worth:
 
 
 9
 MR. MURDOCH: We're here today under a Federal statute under Federal law and I don't think that the finding of the Pennsylvania Supreme Court in the recent case regarding not reducing damages to present worth is applicable in this particular case.
 
 
 10
 THE COURT: We may have to have a little argument on that at some point.
 
 
 11
 MR. MURDOCH: Yes, sir.
 
 
 12
 MR. LIBENSON: Under Federal law, you can add inflation.
 
 
 13
 MR. MURDOCH: If we have expert testimony.
 
 
 14
 THE COURT: That's a little bit down the road and we'll wait on that.
 
 
 15
 App. at 43a.
 
 
 16
 Standing alone, the court's damages discussion in its opinion, id. at 492-93a, may be considered ambiguous; without more, it could be argued that the court was of the view that although this was a federal claim brought in a federal court in Pennsylvania it was required to apply the state law of damages. But when the opinion is read in conjunction with the earlier dialogue between the court and counsel, we are persuaded that the court applied federal law and that the dispute between the parties at trial was limited to the proper federal measure of damages. We conclude that appellant has preserved for review only the question of the proper elements in the federal law of damages under the circumstances of this case.[1] It is to this analysis that we now turn.
 
 B.
 
 17
 Our starting point is the recognition that Article III, § 2 of the Constitution, in extending the judicial power of the United States "to all Cases of admiralty and maritime Jurisdiction,"
 
 
 18
 referred to a system of law coextensive with, and operating uniformly in, the whole country. It certainly could not have been intended to place the rules and limits of maritime law under the disposal and regulation of the several States, as that would have defeated the uniformity and consistency at which the Constitution aimed on all subjects of a commercial character affecting the intercourse of the States with each other or with foreign states.
 
 
 19
 Southern Pacific Co. v. Jensen, 244 U.S. 205, 215, 37 S.Ct. 524, 528, 6 L.Ed. 1086 (1917) (quoting The Lottawanna, 88 U.S. (21 Wall.) 558, 575, 22 L.Ed. 654 (1875)).[2] We must, therefore, apply a uniform federal rule; and our decision is not controlled, as in diversity cases, by the law of the underlying state.
 
 
 20
 This recognition is not the end of the analysis, however, but only the beginning. It is not unusual for a federal court to borrow substantive state law and adopt it as federal law. As expressed by Justice Jackson, a federal court addressing a federal question that cannot be answered by reference to federal statutes alone is "free to apply the traditional common-law technique of decision and to draw upon all the sources of the common law." D'Oench, Duhme & Co. v. F.D.I.C., 315 U.S. 447, 472, 62 S.Ct. 676, 686, 86 L.Ed. 956 (1942) (concurring opinion); see id. at 469, 62 S.Ct. at 684.[3] No rule of state law applies of its own force to compel a particular decision; but we may resort to a rule derived from any source, state, federal, or foreign, if its intrinsic wisdom commends it to the case at hand. Once we have transplanted to federal soil a rule previously adopted by a state court, however, it takes on a new life of its own and grows independently of further modifications or refinements announced by the court which first gave it root. See Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 457, 77 S.Ct. 923, 1 L.Ed.2d 972 (1957); D'Oench, Duhme, 315 U.S. at 469, 62 S.Ct. at 684. (Jackson, J., concurring).
 
 
 21
 Accordingly, we find no jurisprudential impediment to adoption of the state measure of damages. We now turn to prudential and consequential considerations, and we must respect the important concerns of consistency and coherence in the law of damages.
 
 C.
 
 22
 Prior to 1980, the Pennsylvania law of damages for torts did not take into account the pernicious presence of inflation. Thus in 1976 the Pennsylvania Superior Court was of the view that "the erratic behavior of the economy over the past half dozen years, plagued by war and other unusual circumstances, is not a sufficient demonstration that inflation at any predictable rate will continue for another twenty years." It thus dismissed consideration of inflation as "speculative." Havens v. Tonner, 243 Pa.Super. 371, 378, 365 A.2d 1271, 1274 (1976). In 1980, however, Pennsylvania's highest court concluded, "in light of clear scientific evidence of the fact that inflation ... (has) become an established part of our economy," that this factor must be considered in awarding damages for lost future earnings. Kaczkowski, 491 Pa. at 566-67, 421 A.2d at 1030.[4] It held that continued judicial refusal to recognize the impact of inflation, while maintaining the practice of discounting lump sum awards to "alleged present value," id. at 570, 421 A.2d at 1032, would "ignore our responsibility to attempt to 'graduate the amount of the damage award exactly to the extent of the loss.' " Id. at 571, 421 A.2d at 1032 (quoting Forsyth v. Palmer, 14 Pa. 96, 97 (1850)).
 
 
 23
 In a most persuasive opinion, replete with relevant and credible economic data, see, e.g., id. at 572-74 nn. 11-15, 580-81, 421 A.2d at 1033 nn. 11-15, 1037, the court declared:
 
 
 24
 Despite the uninformed belief of the (Havens ) court, inflation and productivity factors are not speculative and are capable of definition and prediction by economic experts. For decades, economists have been refining tools to forecast economic growth and have used these tools with proven accuracy. Sophisticated economic forecasts are relied upon by every major government agency, corporation, and financial institution. These forecasts are based upon all that is known in the American economy and despite small tolerances of error, these projections have been accurate in the past. See, District of Columbia v. Barriteau, D.C.App., 399 A.2d 563, 566 (1979). Thus, there exists a reasonable basis in fact for this court to consider the impact of inflation and productivity on lost future earnings. A court has a responsibility to the citizenry to keep abreast of changes in our society. In light of the recognized acceptance of the science of economics, the courts of this Commonwealth can no longer maintain their ostrich-like stance and deny the admissibility and relevancy of reliable economic data concerning the impact of productivity and inflation on lost future earnings. Indeed, to ignore economic realities and presume that there will be no changes in an individual's future earnings because of such factors is further removed from reality than any variance that may result from our efforts to predict these factors.
 
 
 25
 Id. at 572, 421 A.2d at 1032-33.
 
 
 26
 But the 1980 Pennsylvania decision was not without formidable precedent. In the post World War I inflationary period, over a half century ago, the Vermont Supreme Court cited extensive authority for considering inflation in awarding damages:
 
 
 27
 The result sought by the law in assessing damages in (tort) cases is compensation-so far as a money payment can-the ascertainment of such a sum as will compensate the plaintiff for the injury. Necessarily, damages are to be expressed in terms of money.... As a medium of exchange, its value appreciates or depreciates according to the rise and fall in commodity prices. So it is that, at least so far as those elements of damages properly classed as pecuniary losses-like loss of time, loss of earning power, expenses and the like-are concerned, it is proper for the jury to take into consideration the fact, known to everybody, that the purchasing power of money is at present seriously impaired.
 
 
 28
 Halloran v. New England Telephone & Telegraph Co., 95 Vt. 273, 274, 115 A. 143, 144 (1921).[5]
 
 
 29
 Moreover, state judges have not been alone in recognizing, in Justice Roberts' words, that "the orderly development of the law must be responsive to new conditions and to the persuasion of superior reasoning." Griffith v. United Air Lines, Inc., 416 Pa. 1, 23, 203 A.2d 796, 806 (1964). Over 20 years ago, in a case under the Federal Employers' Liability Act, Judge Friendly wrote that "there is little or no authority in favor of charging the jury to take future inflation into account," but he recognized that "there are few who do not regard some degree of continuing inflation as here to stay and would be willing to translate their own earning power into a fixed annuity." McWeeney v. New York, N. H. & H. R. R. Co., 282 F.2d 34, 38 (2d Cir.) (in banc), cert. denied, 364 U.S. 870, 81 S.Ct. 115, 5 L.Ed.2d 93 (1960). Eleven years later, in a longshoreman's personal injury case, Judge Friendly noted that "if inflation should continue at its present pace, courts may have to reconsider the propriety of the long recognized charge with respect to discount." Yodice v. Koninklijke Nederlandsche Stoomboot Maatschappij, 443 F.2d 76, 79 (2d Cir. 1971) (citing McWeeney ).[6] More recently, in Doca v. Marina Mercante Nicaraguense, S.A., 634 F.2d 30, 36 (2d Cir. 1980), cert. denied, 451 U.S. 971, 101 S.Ct. 2049, 68 L.Ed.2d 351 (1981), a second circuit panel in an LHWCA case surveyed the economic literature demonstrating the persistence of strong inflationary pressures and held that "inflation should be considered in estimating the present value of lost future wages." See also, e.g., Steckler v. United States, 549 F.2d 1372, 1375-78 (10th Cir. 1977) (Federal Tort Claims Act); Freeport Sulphur Co. v. S/S Hermosa, 526 F.2d 300, 308-11 (5th Cir. 1976) (Wisdom, J., specially concurring) (admiralty); and United States v. English, 521 F.2d 63, 72-76 (9th Cir. 1975) (Tort Claims Act). And the virulent influence of inflation was strikingly brought home to federal judges in The Report of the Commission on Executive, Legislative, and Judicial Salaries (December, 1980) at 7-9. The report disclosed the following:
 
 
 30
 * From 1969 to 1980, the Consumer price index rose by more than 130 per cent.
 
 
 31
 * During the same period, the Hourly Earnings Index, which reflects wage rates in the private, non-farm economy, also rose by more than 130 per cent.
 
 
 32
 * The 1980 $57,500 salary for U.S. Circuit Judges amounted to $24,400 in terms of 1969 dollars or a reduction of 43 per cent.
 
 
 33
 Notwithstanding the reticence of the courts in an earlier era, it cannot be argued effectively today that inflation has been only a temporary phenomenon on the American scene. If this reality of modern economic life can be considered in calculating damages without resorting to speculation, it should be conceded that when relevant, consideration of inflation qualifies under the criteria of "justice," "common sense," and "public policy" generally used by the courts in evaluating the consequences of embracing a new and attractive rule of law-what legal philosophers are wont to describe as "utilitarian" in the Benthamite scale of supposedly measurable aggregates of pleasures and pains.[7] If the spectre of "speculation" is removed, a matter we shall address later, our immediate task is to determine whether the Kaczkowski formula is congruent with the federal law of damages in maritime cases. We believe it is.
 
 D.
 
 34
 The relevant federal law of damages is familiar and uncomplicated, and is not materially different from comparable state law. This court carefully surveyed the case law and delineated the permissible elements of recovery in Downie v. United States Lines Co., 359 F.2d 344, 347-48 (3d Cir.) (in banc), cert. denied, 385 U.S. 897, 87 S.Ct. 201, 17 L.Ed.2d 130 (1966). We adhered in that decision to the general rule that a seaman injured by the tortious conduct of his employer is entitled to an award of damages commensurate with the nature and extent of his injuries. He is entitled to reimbursement for his loss of earnings, past and prospective; for any impairment of his earning capacity; for medical expenses incurred and to be incurred; and for any other economic loss he may have sustained or is likely to sustain. He is also entitled to redress for his physical injury, including the effects thereof, such as pain, suffering, mental anguish, discomfort, and inconvenience. If the injuries are permanent and result in an impairment of earning capacity, he may recover damages for such impairment, including (but not limited to) his probable loss of future earnings. Damages resulting from the impairment of earning capacity and the probable loss of earnings must be measured on the basis of life expectancy at the time of injury. The award must be based upon the probable pecuniary loss reduced to its present net worth. The injured worker is also entitled to compensation, again based on life expectancy at the time of the injury, for the physical and mental effects of the injury on his ability to engage in those activities which normally contribute to the enjoyment of life, including, for example, his avocations. The specific elements of such an award necessarily depend upon the proofs. There are no precise criteria by which these elements may be evaluated, but they are measurable to the same extent as pain, suffering, and mental anguish.
 
 
 35
 Full compensation for lost prospective earnings is most difficult, if not impossible, to attain if the court is blind to the realities of the consumer price index and the recent historical decline of purchasing power. Thus if we recognize, as we must, that the injured worker is entitled to reimbursement for his loss of future earnings, an honest and accurate calculation must consider the stark reality of inflationary conditions.
 
 IV.
 
 36
 What had troubled the courts for years was the speculative nature of predicting future inflationary trends. The Pennsylvania Court has not only recognized this problem but met it head on by adopting what is known as the "total offset method," a variation of methods introduced by the federal district court in Feldman v. Allegheny Airlines, Inc., 382 F.Supp. 1271 (D.Conn.1974), aff'd in pertinent part, 524 F.2d 384 (2d Cir. 1975), and the Alaska Supreme Court in Beaulieu v. Elliott, 434 P.2d 665 (1967), and State v. Guinn, 555 P.2d 530 (1976). The total offset method avoids the danger of speculating as to the future rate of inflation by making what we consider a very sensible accommodation: it assumes that in the long run the effects of future inflation and the discount rate will co-vary significantly with the other. See authorities cited in Kaczkowski, 491 Pa. at 581, 421 A.2d at 1037. Moreover, we are impressed by the pragmatic considerations embraced by the Pennsylvania court:
 
 
 37
 An additional virtue of the total offset method is its contribution to judicial efficiency. Litigators are freed from introducing and verifying complex economic data. Judge and juries are not burdened with complicated, time consuming economic testimony. Finally, by eliminating the variables of inflation and future interest rates from the damage calculation, the ultimate award is more predictable.
 
 
 38
 Id. at 583, 421 A.2d at 1038.
 
 
 39
 We are impressed by the "total offset method" because it both accommodates the reality of inflation and bids fealty to the concept of reducing future earnings to present worth. It makes a judgment-evaluative to be sure, but no better or no worse than the varying prognostications of expert witnesses-that the rate of future inflation will be equivalent to future interest rates. From a pragmatic viewpoint, lost future earnings need not be discounted to present value, although the formula calls for a theoretical reduction to present worth, because the inflation and discount rates are legally presumed to be equal and cancel one another.
 
 
 40
 We find the foregoing analysis coherent and consistent with the elements of damages discussed in previous case law. It does not contradict valid and binding rules of our court. The total offset formula embodies the continued requirement of reduction to present worth, see Chesapeake & Ohio Railway Co. v. Kelly, 241 U.S. 485, 36 S.Ct. 630, 60 L.Ed. 1117 (1916); Downie, 359 F.2d at 347, and it avoids considerations that would tend to introduce an illicit speculative element into the computations. Indeed, by eliminating the discount factor from the jury's or the court's calculations, the total offset method will tend to eliminate the necessity for speculation, to introduce greater certainty into the parties' own calculations, and thereby perhaps to facilitate settlement of personal injury claims without the necessity of judicial intervention. We therefore hold that the district court did not err in computing damages for the loss of future earnings, because it is not necessary to go through the process of discounting lump sum awards to theoretical present value; the discount factor is presumed equal to and offset by the impact of inflation on the future economic value of the award.
 
 V.
 
 41
 Appellant's final contention is a challenge to the factual predicate of the court's computation of projected earnings. It argues that the court erred in using the minimum wage as a factor instead of the wage J&L pays its light duty employees. At bottom this is a question of fact finding reviewed under the "clearly erroneous" standard. Fed.R.Civ.P. 52(a); see Krasnov v. Dinan, 465 F.2d 1298, 1302-03 (3d Cir. 1972). We do not view the findings as clearly erroneous.VI.
 
 
 42
 The judgment of the district court will be affirmed.
 
 SUR PETITION FOR REHEARING
 
 43
 Before SEITZ, Chief Judge, and ALDISERT, ADAMS, GIBBONS, HUNTER, WEIS, GARTH, HIGGINBOTHAM, SLOVITER, BECKER and VAN DUSEN, Circuit Judges.
 
 
 44
 The petition for rehearing filed by Appellant in the above entitled case having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied.
 
 
 45
 Circuit Judges ADAMS and JAMES HUNTER, III, would grant the petition for rehearing.
 
 Statement of Circuit Judge ADAMS:
 
 46
 Judge Adams believes that the damages rule established in this case-that inflation and interest rates will be deemed to offset one another so that no discount to present value is necessary-is likely to have considerable consequences for a great many subsequent cases. Although it may be that economic conditions warrant this dramatic change in our system of calculating damages, the presence at this time of very high interest rates and substantially reduced inflation would suggest caution in adopting a rule that appears to be premised on some immutable relationship between interest and inflation.[1] Even if the newly-adopted damages rule is appropriate under today's economic situation, institution of the rule is a matter of unusual importance that merits consideration by the full Court. Moreover, because the rule implicates interests and affects parties in a wide range of litigation settings, rehearing in banc would provide an opportunity for this Court to consider amicus briefs from other groups concerned with the damages rule. Accordingly, he dissents from the denial of rehearing in banc.
 
 
 47
 Circuit Judge JAMES HUNTER, III, also would grant rehearing and joins in Circuit Judge ADAMS' statement.
 
 
 
 [1]
 For a reviewing court to determine that there is reversible error, three critical prerequisites must be implicated in the judicial error-correcting process. It is necessary that there be (a) specific acts or omissions by the trial court constituting legal error, (b) properly suggested as error to the trial court, and (c) if uncorrected on that level, then properly presented for review to the appellate court. For there to be reversible error, it is mandatory for the appellant properly to identify the error to the trial court and to suggest a legally appropriate course of action. The reasons for this requirement go to the heart of the common law tradition and the adversary system. It affords an opportunity for correction and avoidance in the trial court in various ways: it gives the adversary the opportunity either to avoid the challenged action or to present a reasoned defense of the trial court's action; and it provides the trial court with the alternative of altering or modifying a decision or of ordering a more fully developed record for review. This philosophy is embodied in the Federal Rules of Civil Procedure. Thus, Rule 46 requires a party to "mak(e) known to the court the action which he desires the court to take or his objection to the action and his grounds therefor." (Emphasis supplied.)
 
 
 [2]
 See also Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 409, 74 S.Ct. 202, 204, 98 L.Ed. 143 (1953) (plaintiff's "right of recovery for ... negligence is rooted in federal maritime law"); 1A Benedict on Admiralty § 2 at 1-4 (7th ed. 1981) ("the maritime law must be uniform throughout the nation and state legislation may not introduce disharmonious elements"); H.R.Rep.No.1441, 92d Cong., 2d Sess. ----, reprinted in 1972 U.S.Code Cong. & Ad.News 4698, 4705 ("The Committee intends that legal questions which may arise in actions brought under (the 1972 amendments to LHWCA) shall be determined as a matter of Federal law")
 
 
 [3]
 See also, e.g., Imbler v. Pachtman, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), which held that the same considerations of public policy that underlie the common law rule of absolute immunity of state prosecutors from tort liability countenance absolute immunity under 42 U.S.C. § 1983; Moragne v. States Marine Lines, Inc., 398 U.S. 375, 390-93, 90 S.Ct. 1772, 1782-83, 26 L.Ed.2d 339 (1970), relying on state wrongful death statutes in recognizing a right of action for wrongful death under federal maritime law; Monroe v. Pape, 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492 (1961), holding that 42 U.S.C. § 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions;" Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 457, 77 S.Ct. 923, 1 L.Ed.2d 972 (1957), which held that in fashioning substantive federal law under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, "state law, if compatible with the purpose of § 301, may be resorted to in order to find the rule that will best effectuate the federal policy;" and United States v. Hext, 444 F.2d 804, 809-11 (5th Cir. 1971), looking to Article 9 of the Uniform Commercial Code as a source of federal common law governing suits arising from Farmers' Home Administration secured loan transactions, under the doctrine of Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943)
 
 
 [4]
 Writing for the court, Justice Nix defined inflation as follows:
 Inflation is "the increase in the volume of money and credit relative to available goods resulting in a substantial and continuing rise in the general price level." Websters, Third International Dictionary (1965). Inflation gains are measured in terms of what the average person refers to as "cost of living increases." An example of inflation evidencing an increase in prices unrelated to an increase in intrinsic value is that the juice content of oranges has not increased in years, but their price continues to rise.
 The presence of inflation plays two distinct roles in an award for prospective damages. The first role is determining the impact of inflation on the future earnings of the victim. The second place in which inflation plays a part is in determining the appropriate interest rate to discount the future damage award to its present value.
 
 
 [491]
 Pa. at 565 n.4, 421 A.2d at 1029 n.4
 
 
 [5]
 A comprehensive list of state cases is set forth in Feldman v. Allegheny Airlines, Inc., 382 F.Supp. 1271, 1290 (D.Conn.1974), aff'd in pertinent part, 524 F.2d 384 (2d Cir. 1975). See also Annot., 12 A.L.R.2d 611
 
 
 [6]
 The court in Yodice declined to undertake the suggested reconsideration because "the complete absence of economic data in the present record and the relatively small loss of future earnings" made it "difficult to imagine a case which would be a more inappropriate vehicle for that purpose." 443 F.2d at 79. Given the extensive subsequent development in the common law, the present economic certainty of continuing inflation, and the careful presentation of the issue in an adversarial context in this case, we are not now limited by the factors that properly counselled restraint in Yodice ; and we believe that the time has arrived for the reconsideration invited in that decision
 
 
 [7]
 See N. MacCormick, Legal Reasoning and Legal Theory 105 (1978)
 
 
 [1]
 Other Courts of Appeals have considered the problem of accounting for inflation in damage awards, and have arrived at outcomes that are somewhat at variance with the rule adopted here. The Second Circuit, for example, after reviewing economic literature in the field, ruled that damage awards should still be discounted to reflect a "real" interest rate, untainted by inflation, estimated at about one to two percent. Doca v. Marina Mercante Nicaraguense, S.A., 634 F.2d 30, 39-40 (2d Cir. 1980); accord, O'Shea v. Riverway Towing Co., 677 F.2d 1194, 1201 (7th Cir. 1982). The Fifth Circuit, which has until now applied a higher discount rate, recently voted to reconsider in banc the proper treatment of inflation in calculating damage awards. Byrd v. Reederei, 638 F.2d 1300, rehearing granted, 650 F.2d 1324 (5th Cir. 1981)