**William W. EVANS, Plaintiff,**

v.

**UNITED ARAB SHIPPING COMPANY (S.A.G.) and M/V AL WATTYAH, her engines, boilers, equipment, etc., Defendants.**

Civ. No. 89–5246(SSB).

United States District Court,
D. New Jersey.

July 30, 1991.

Edward V. Cattell, Jr., Jeffrey S. Moller, Clark, Ladner, Fortenbaugh & Young, Haddonfield, N.J., for plaintiff.

Cary Robert Wiener, William E. Bell, Kirlin, Campbell & Keating, Caldwell, N.J., for defendants.

### FINDINGS OF FACT and CONCLUSIONS OF LAW

BROTMAN, District Judge:

In reaching its findings of fact and conclusions of law in this maritime suit for negligence, the court must confront an issue explicitly left open by the Supreme Court's recent decision in *McDermott International, Inc. v. Wilander*, —— U.S. ——, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991): whether a river pilot who is not permanently attached to a ship is a Jones Act seaman. Because the court finds that a river pilot was a seaman under general maritime law at the time Congress passed the Jones Act in 1920, it concludes that this plaintiff is entitled to the protection afforded by that Act.

*JURISDICTION*

This is an admiralty and maritime claim by the plaintiff for personal injuries against the defendant, which is a sovereign owned shipping company. Jurisdiction is based on 28 U.S.C. § 1333 and the Foreign Sovereign Immunities Act, 28 U.S.C. § 1330. This court held a nonjury bench trial on March 4–7, 1991.

*FINDINGS OF FACT*

1. Plaintiff, William W. Evans, was at all times material to the events leading up to this suit licensed as a first class pilot by the state of Delaware, Board of Pilot Commissioners, and the United States Coast Guard and was a member of the Pilot's Association for the Bay and River Delaware. Mr. Evans has performed his entire career (over forty years) as a licensed pilot hired to steer ships through the Delaware River and Bay and the Chesapeake and Delaware (C & D) Canal.

2. Defendant, United Arab Shipping Company (UASC), owns and operates the container freight M/V AL WATTYAH. UASC is owned by the governments of Saudi Arabia, Kuwait, Iraq, United Arab Emirates, Bahrain and Qatar. The M/V AL WATTYAH is a diesel-powered vessel of 20,526 tons, 183.24 meters in length, 27.49 meters in beam and 10.015 meters in depth.

3. On the night of September 9–10, 1989, Mr. Evans was on call at the pilot station at Lewes, Delaware. At approximately 1:00 a.m., he was called to pilot the M/V AL WATTYAH toward the C & D Canal as far as Chesapeake City, Maryland, where a Maryland pilot would take over the helm. At approximately 2:00 a.m., Mr. Evans was taken by pilot launch to the ship, which was situated in the pilotage area between Cape May and Cape Henlopen; he boarded the ship by pilot ladder, also known as a Jacob's ladder, which is a rope ladder with wooden rungs. Mr. Evans experienced difficulty with the pilot ladder due to its poor condition. He then assumed the "conn" of the vessel at approximately 2:30 a.m. and, without incident, piloted the ship toward the Maryland border in clear and calm weather.

4. Upon approaching the point where the Maryland pilot would be boarding, Mr. Evans requested the master of the vessel to have the starboard side accommodation ladder rigged to allow his disembarkation; plaintiff wanted to avoid using the faulty pilot ladder. An accommodation ladder is used in calm waters on ships without excessive freeboard. It is a staircase built of galvanized steel or aluminum that is attached at its top to the main deck of the vessel and is lowered by means of a winch to within a few feet of the water's surface. At the lower end is a platform that can be adjusted, depending on the height of the vessel's freeboard and the ladder's angle of suspension, to remain parallel with the water's surface. This lower platform is fixed in position after adjustment by means of a pin which passes through an intersecting "sandwich" of metal bars and holds it rigidly in place.

The accommodation ladder is also equipped with handrails that are designed to fold back along the channels of the ladder by means of pivoting stanchions. When the ladder is fully extended, the stanchions are designed to pivot upright and then be secured with chains or ropes.

5. The Maryland pilot was transported to the M/V AL WATTYAH by the pilot launch at Chesapeake City, which was driven by John Stringer. When the launch was in position alongside the ship, the Maryland pilot stepped from the foredeck of the launch directly on to the lower-most rung of the accommodation ladder, stepping over the lower platform. Transcript of March 4 at 38–41 (testimony of Stringer).

6. Some minutes later, a seaman headed down the accommodation ladder to deliver Mr. Evans' briefcase and to assist him in leaving the ship. As the seaman stepped on the lower platform it pivoted on its axle and dropped, causing the sailor to fall. The seaman was able to hoist himself aboard the launch, then examined the lower platform on hands and knees. According to Stringer, he appeared to be reaching for something and adjusting the underside of the lower platform. Transcript of March 4 at 42.

7. At this time, Mr. Evans appeared at the upper platform of the accommodation ladder and saw that the sailor was on his hands and knees adjusting the lower platform. Mr. Evans asked the two officers who had accompanied him to the ladder what the sailor was doing and whether it was safe to use the ladder. Neither officer responded with anything more than a shrug of the shoulders. Evans Deposition at 87–88. Mr. Evans then shouted down to the sailor, who by this time was on his feet facing up the ladder with one hand on the ladder's handrail and the other on the launch's bow rail. The seaman made no gesture or sign to Mr. Evans other than to make direct eye contact, which he understood as an indication that the ladder was safe; he then began his descent. On his way down he noticed a pile of rope in disarray on the lower platform.

8. When Mr. Evans reached the lowermost rung of the ladder with his left foot, he placed his right foot on to the lower platform and released his hand from the inboard handrail. He then began to swing his left leg over to the deck of the launch but when he transferred his weight to his right leg, the platform dropped, pivoting on its axle. Mr. Evans then attempted to prevent himself from falling between the ship and launch by shifting his weight to the outboard handrail. This handrail collapsed, however, and Mr. Evans' body swung in a 270 degree turn. His tailbone (coccyx) hit the deck of the launch and his face and left rib cage struck the outboard channel of the accommodation ladder. Evans Deposition at 46–53. The sailor then assisted Mr. Evans on to the launch.

9. Plaintiff's version of this event was unrebutted at trial and was corroborated in significant detail by Mr. Stringer, the launch driver, who witnessed the entire incident. Although he did not actually see the platform collapse, both times he heard a "clang" sound and he saw Mr. Evans fall. March 4 Transcript at 43–45. When Mr. Evans entered the launch's cabin, Mr. Stringer said, "The same exact thing happened to that crewman." Evans Deposition at 54. He also observed that Mr.

Evans appeared visibly shaken and pale, and did not assist, as was his custom, with the handling of mooring lines upon reaching the dock. Transcript of March 3 at 45–46. Mr. Evans took a taxicab to his car, then drove himself home and went to sleep.

10. Mr. Evans was experiencing pain in his nose, ribs and tailbone. When he arose the morning of September 11, he blew his nose and "blood just gushed out." Evans Deposition at 63. He immediately contacted his family physician, Dr. Bell, who had x-rays taken of his spine, ribs and nose. The x-rays revealed that Mr. Evans had suffered a fractured nose; plaintiff claims that he also suffered a fractured coccyx and a possible fractured rib but was unable to present any corroborating evidence to that effect.

11. Mr. Evans was on medical leave from his piloting duties for an extended period of time. There was some factual dispute at trial as to the amount of time that passed before Mr. Evans was able to recover sufficiently from his orthopedic injuries to return to work. The Pilot Association's logbook indicates that Mr. Evans next piloted a ship on October 26, 42 days after the accident on the M/V AL WATTYAH. However, Mr. Evans had to wait several days between the time he informed the dispatcher that he was available for work and his first assignment. March 6 Transcript at 31–32. Therefore, the court concludes, Mr. Evans' orthopedic injuries caused him to miss 38 days of work.

12. Within one or two days after the September 10 accident, Mr. Evans and his wife each noticed for the first time a distinct slurring of his speech and a pronounced weakness or lack of balance in his gait. He immediately sought medical attention for these symptoms and was referred to a specialist in neurology. Unfortunately, however, Mr. Evans' speech and balance problems increased to such an extent that, when he returned to piloting on October 26, numerous complaints were registered about the hazards presented by his condition. At the request of the Association's president and upon the advice of his doctors, Mr. Evans took a medical leave of absence beginning November 10, 1989. In June, 1990, he was unable to pass the physical exam he needed to renew his state pilot's license, which expired on September 1, 1990. He has not piloted a boat since November 10, 1989.

Since the first symptoms of plaintiff's neurological condition appeared, there has been a steady deterioration in his ability to speak and walk. Mr. Evans has fallen several times, fracturing his hip and wrist, and is expected to be wheelchairbound shortly. At trial, Mr. Evans walked with the assistance of a walker and his speech was dramatically slurred. His doctors predict that he will die within one or two years; however, if he elects to use artificial respiratory and nutritional devices, and with the assistance of 24–hour residential nursing care, he could prolong his life another year or two beyond that time.

13. A professional associate of the plaintiff, pilot George Mcintire, was with him for a full week in early July, 1989 at a ship handling school in Grenoble, France. According to Mcintire, who was with him during that entire week, plaintiff appeared healthy and vigorous at all times; they took long walks together each evening and he participated fully in the school's curriculum. No signs of any neurological problems were evident.

14. Dr. Cook, Mr. Evans' medical expert in neurology and treating neurologist, noted on January 16, 1990 that "prefall," i.e., before the September 10 accident on the AL WATTYAH, plaintiff said his legs were tired and his balance was off. March 5 Transcript at 32–33. Dr. Bhatt, plaintiff's other treating neurologist, similarly testified that at plaintiff's examination on October 4, 1989, he had complained of difficulty walking and with balance "for the last few months." March 7 Transcript at 24.

15. No doctor has been able to provide a definitive diagnosis of Mr. Evans' neurological condition. Dr. Cook described it as an unusual genus of motor neuron disease that resembles amyotrophic lateral sclerosis (ALS), also known as Lou Gehrig's disease. He also testified that Mr. Evans' disease probably pre-existed the fall but

laid dormant. Defendant's medical expert, Dr. Duvoisin, submitted a pretrial report stating that plaintiff's symptoms resembled olivopontocerebellar atrophy and Parkinsonism, and ultimately described it as a chronic progressive diffuse neurodegenerative disorder. Defendant's Exhibit 1B. At trial, Dr. Duvoisin said that plaintiff probably had a nerve degeneration problem similar to ALS.

16. The state of medical knowledge as to the causation of motor neuron disease like that present in Mr. Evans is similarly imprecise. Dr. Cook stated outright that "[w]e don't really know what causes motor neuron disease or ALS." March 5 Transcript at 18. Dr. Cook testified that there is anecdotal evidence in the medical literature that trauma is a causative factor of the disease. It was his opinion that it was "likely" or "possible" that plaintiff's pre-existent motor disease was aggravated by the traumatic event on September 10. However, he could not say that it was "probable."

Dr. Duvoisin categorically ruled out trauma as playing any causative role in plaintiff's neurological problems. March 7 Transcript at 34–35. Dr. Duvoisin described his research as exclusively directed toward finding a genetic link to the disease. On cross-examination, he was presented with four research articles listing trauma as one possible cause of the disease but dismissed them as not convincing. Ultimately, he conceded that he could not conclusively rule trauma out as a causative factor, though he considered it so improbable as to be "philosophically meaningless." March 7 Transcript at 42.

## CONCLUSIONS OF LAW

### A. *Evans' Status as a Jones Act Seaman*

The threshold question before the court is whether Mr. Evans, as a river pilot, is a "seaman" and therefore entitled to the protection of the Merchant Marine Act of 1920, otherwise known as the Jones Act, 46 U.S.C.App. § 688. As we shall see, the answer is "of paramount importance" to the outcome of plaintiff's case, since "the seaman's remedies are far more favorable than those available to other maritime workers." Robertson, *A New Approach to Determining Seaman Status*, 64 Tex. L.Rev. 79, 83 (1985).

Defendant argues that plaintiff cannot possibly meet the traditional common law requirement that a Jones Act seaman be permanently assigned to defendant's vessel or perform a substantial amount of his work aboard it. *See Bach v. Trident Steamship Co.*, 920 F.2d 322 (5th Cir.1991) (river pilot is not a Jones Act seaman because not permanently attached to a vessel or fleet of vessels); *King v. Universal Electric Construction Co.*, 799 F.2d 1073 (5th Cir.1986). This court's reading of the cases supporting defendant's argument would compel it to agree. *See, e.g., Griffith v. Wheeling Pittsburgh Steel Corp.*, 521 F.2d 31 (3d Cir.1975), *cert. denied*, 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976); *Clark v. Solomon Navigation, Ltd.*, 631 F.Supp. 1275 (S.D.N.Y.1986). Plaintiff argues that the Supreme Court's recent decision in *McDermott* leads to the inevitable conclusion that the "permanent attachment" element of seaman status is no longer required; it is enough that plaintiff was employed to assist in the performance of the vessel's functions. In addition, the court notes that reliance on the Fifth Circuit's decision in *Bach* would be dangerous in light of the Supreme Court's recent decision to remand *Bach* "for further consideration in light of *McDermott.*" —— U.S. ——, 111 S.Ct. 2253, 114 L.Ed.2d 706 (1991).

The court's inquiry, of course, must begin with the Supreme Court's unanimous decision in *McDermott*, —— U.S. ——, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991).[1] The question before the Court on that occasion was whether a paint foreman, who did not aid in a ship's navigation, nevertheless qualified as a seaman under the Jones Act. The Court answered this question in the

---

1. As the Supreme Court acknowledged in *McDermott*, its precedents in this area "led the lower courts to a 'myriad of standards and lack of uniformity in administering the elements of seaman status.'" *Id.*, 111 S.Ct. at 816, *quoting* Engerrand & Bale, *Seaman Status Reconsidered*, 24 S.Tex.L.J. 431, 494 (1983).

affirmative by jettisoning the aid in navigation requirement. Since the Jones Act does not define who a seaman is,[2] the Court assumed that Congress intended to use the term in the same way that other admiralty courts had used it. *Id.* at 811. The Court's first task, therefore, was to determine who was a seaman under the general maritime law when Congress passed the Jones Act. *Id.*

The Court then conducted an in-depth analysis of the historical bases of the maritime worker's negligence suit against the ship's owner and found that a great variety of shipworkers were considered seamen at the time the Jones Act was passed. The Court, however, gave only limited guidance on the applicability of other common law requirements of seaman status, stating:

> The key to seaman status is employment-related connection to a vessel in navigation. We are not called upon here to define this connection in all details, but we hold that a necessary element of the connection is that a seaman perform the work of a vessel. See *Maryland Casualty Co. v. Lawson*, 94 F.2d 190, 192 (CA5 1938) ("There is implied a definite and permanent connection with the vessel, an obligation to forward her enterprise"), cited approvingly in *Norton,* [*v. Warner Co.*] 321 U.S. [565] at 573, 64 S.Ct. [747] at 751 [88 L.Ed. 931 (1944)]. In this regard, we believe the requirement that an employee's duties must "contribut[e] to the function of the vessel or to the accomplishment of its mission" captures well an important requirement of seaman status.

*Id.* at 817.

This court, therefore, must fill in the gap left by *McDermott* and reach the appropriate definition of seaman as applied to a river pilot who has no permanent connection to any one ship yet whose only duties place him at the most important post on the ship—the ship's helm. It does so, however, not without guidance. As explained above, the Court instructed lower courts to determine who is a seaman by examining general maritime law at the time Congress passed the Jones Act. *Id.* at 811.

In fact, the *McDermott* decision itself answers the question whether a river pilot was a seaman under general maritime law in 1920. Although endeavoring to determine the propriety of the "aid in navigation" test, the Court noted that pilots were considered seamen as early as 1832, when Justice Story wrote: "A cook and steward are seamen in the sense of the maritime law, although they have peculiar duties assigned them. *So a pilot,* a surgeon, a ship-carpenter, and a boatswain, are deemed seamen, entitled to sue in admiralty." *Id., quoting United States v. Thompson,* 28 F.Cas. 102 (No. 16,492) (CCD Mass.1832) (emphasis supplied). The *McDermott* Court also observed that "[b]y the middle of the 19th century, the leading admiralty treatise noted the wide variety of those eligible for seamen's benefits: "Master, mates, sailors … pilots … women as well as men,—are mariners.'" *Id., quoting* E. Benedict, The American Admiralty § 278, p. 158 (1850).

This court's own research lends further support to this conclusion. In a series of cases concerning the states' power to regulate pilots and pilotage in ports and harbors, the Supreme Court wrote of this class of mariners that they were

---

**2.** The only definition of "seaman" provided by Congress is found at 46 U.S.C. § 10101, which states: (3) "seaman means an individual (except scientific personnel, a sailing school instructor or a sailing student) engaged or employed in any capacity on board a vessel." This provision was enacted in 1983 as part of Congress' effort "to revise, consolidate and enact certain laws related to vessels and seamen as subtitle II of title 46, United States Code." H.R.Rep. No. 338, 98th Cong., 1st Sess. 1, *reprinted in* 1983 U.S.Code Cong. & Admin. News 924, 924. The definition of seaman is found at "Part G—Mer-

chant Seaman Protection and Relief" and the legislative history indicates merely that "Section 10101 defines the terms master, seaman, and owner as they apply to merchant seamen's protection and relief." H.R.Rep. No. 338, 1983 Code Cong. & Admin. News at 1004. This definition, however, had its genesis in Act of Dec. 21, 1898, c. 28, §§ 23, 26, R.S. § 4612 (30 Stat. 762, 764) and was derived from Act of June 7, 1872, c. 322, § 65, 17 Stat. 277.

The court notes that this definition contains no requirement that a seaman have a permanent connection to a vessel.

as much a part of the commercial marine as the hull of the ship and the helm by which it is guided ... Pilots are a meritorious class, and the service in which they are engaged is one of great importance to the public. It is frequently full of hardship, and sometimes of peril; night and day, in winter and summer, in tempest and calm, they must be present at their proper places and ready to perform the duties of their vocation. *Ex parte McNiel*, 80 U.S. (13 Wall.) 236, 237–38, 20 L.Ed. 624 (1871). In *The China*, the Supreme Court noted that statutes requiring ships to hire pilots were beneficial "by providing a body of trained and skilful *seamen*, at all times ready for the service, holding out to them sufficient inducements ... to pursue a business attended with so much of peril and hardship." 74 U.S. (7 Wall.) 53, 67, 19 L.Ed. 67 (1868). *See also The Alameda v. Neal*, 32 F. 331 (CC NDCal 1887) (object of pilotage fees "was to create a body of hardy and skillful seaman, thoroughly acquainted with the harbor, to pilot vessels seeking to enter or depart from the port"). In another case, the Supreme Court observed no significant difference between pilots who accompany a ship on a voyage and those local or port pilots "whose employment lasts but a few hours, and who have no connection with any vessel except to bring into or take it out of port. The term pilots is equally applicable to [both] classes of persons...." *Steamship Company v. Joliffe*, 69 U.S. (2 Wall.) 450, 461–62, 17 L.Ed. 805 (1864).

Lower courts that were faced with deciding whether pilots were protected under the general maritime law came to the same conclusion. Thus, in *The Mary Elizabeth*, the Circuit Court in the Southern District of Alabama, declared that "[a] pilot, being a person employed in the navigation of a vessel, is deemed a seaman, and his claim for wages is within the admiralty jurisdiction." 24 F. 397 (CC SDAla 1885). And in *Wilson v. The Ohio*, the court held that a pilot on a steamboat navigating the river Delaware is entitled to sue in admiralty for his wages. 30 F.Cas. 149, 150 (Case No. 17, 825) (E.D.Pa.1834). Finally, in yet another case from this Circuit, the court assumed that a pilot of a steam vessel, who is a licensed and sworn officer, is a seaman. *The Lud Keefer, Werling v. The Lud Keefer*, 51 F. 44 (3d Cir.1892).

This court, as did the Supreme Court in *McDermott*, must also consider the importance of the Longshore and Harbor Workers' Compensation Act (LHWCA), 44 Stat. (part 2) 1424, as amended, 33 U.S.C. §§ 901–950 in defining a Jones Act seaman. As the Court wrote:

> The LHWCA provides relief for land-based maritime workers, and the Jones Act is restricted to "a master or member of a crew of the vessel" ... [which] is a refinement of the term "seaman" in the Jones Act; it excludes from LHWCA coverage those properly covered under the Jones Act. Thus it is odd but true that the key requirement for Jones Act coverage now appears in another statute.

*McDermott*, 111 S.Ct. at 813. Thus, the term "master or member of a crew," which is used in the LHWCA to exclude coverage, is identical to the term "seaman" for Jones Act purposes. According to the Court, both terms refer to "a sea-based maritime employee." *Id.* at 814.

In 1927, shortly after its passage, the federal agency charged with enforcing the LHWCA issued a definitive ruling that a river pilot is a master or member of a crew and, therefore, excluded from LHWCA coverage. *Longshoremen's Act, Opinion # 22*, 1928 AMC 263 (U.S. Employee's Comp.Comm.1927). The Commission, after examining various court pronouncements on the duties of pilots, concluded that "the pilot merely takes over for the time being some of the duties pertaining to navigation which devolve upon the master." *Id.* at 264. Significantly for this case, the Commission placed a river pilot within the class of master or member of the crew despite his temporary attachment to the vessel. This court must accord substantial weight to the Commission's conclusion, for the Supreme Court has held that its findings, if there is evidence to support them, are "conclusive." *South Chicago Coal & Dock Co. v. Bassett*, 309 U.S. 251, 257–58, 60 S.Ct. 544, 547–48, 84 L.Ed. 732

(1940). This court's own conclusion must be that a river pilot is a master or member of a crew and, therefore, is a Jones Act seaman.

Notably, Judge Brown reached the same conclusion in his powerful and persuasive dissent in *Bach v. Trident*, 920 F.2d at 327–33. Quoting from the ancient admiralty codes, pointing out the broad sweep of Supreme Court precedent and citing congressional activity in this area, Judge Brown recognized that the safe conduct of a vessel's mission could not be accomplished without the pilot; he is "indispensable." "The vessel may not operate without him/her. That pilot is in supreme command of the basic function of the vessel— to navigate in maritime commerce. That person is a seaman or he/she is nothing." *Id.* at 333. This court believes that the Supreme Court would also so find.

From this legal conclusion, the court must determine if this plaintiff is a seaman. As the Supreme Court noted in *McDermott*, this question is best characterized as a mixed question of law and fact. 111 S.Ct. at 818. Since this court sits as the factfinder in this nonjury case, it must find the facts and apply the legal standard to those facts.

It is undisputed that Mr. Evans' entire career was spent as a river pilot and that on the morning of September 10, 1989, he was acting in that capacity aboard the M/V AL WATTYAH when the accident occurred. The ship's owner employed Mr. Evans through the services of the Pilot's Association, an organization of river pilots in the area. Therefore, he had that "employment-related connection" essential to determining seaman status. It is also undisputed that Mr. Evans' work on the M/V AL WATTYAH contributed to the function and mission of the ship. It can fairly be said that plaintiff's job required him to confront the perils and hazards of the sea that any other member of the ship's crew faces on a daily basis. Mr. Evans, therefore, is entitled to the protection of the Jones Act.

## B. *Negligence and Causation*

Under the Jones Act, the employer, by its officers and crew, owes the plaintiff the obligation to exercise ordinary reasonable care for his safety. "A ship must provide a safe place to work to a seaman, or one who performs tasks traditionally performed by a ship's crew; that duty encompasses a reasonably safe means of boarding, and departing from the vessel, and failure to discharge it constitutes negligence." *Southard v. Independent Towing Co.*, 453 F.2d 1115, 1118 (3d Cir.1971). A seaman may also recover for his injuries caused by any defect or insufficiency in equipment due to the ship owner's negligence. 46 U.S.C. § 688, incorporating by reference 45 U.S.C. § 51 (the Federal Employers' Liability Act (FELA)). The Supreme Court has instructed the lower courts to interpret the term liberally "so as to include all the meanings given to it in the light of the peculiar hazards of the seafaring profession." Norris, The Law of Seamen § 690, p. 374–75 (1970); *see also Johnson v. Offshore Exp., Inc.*, 845 F.2d 1347, 1352 (5th Cir.1988), *cert. denied*, 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 533 ("[e]vidence of the 'slightest' negligence is sufficient").

■ If the duty owed to the seaman is breached, plaintiff must show only that the breach " 'played any part, even the slightest, in producing the injury or death for which damages are sought.' " *Ferguson v. Moore-McCormack Lines*, 352 U.S. 521, 523, 77 S.Ct. 457, 458, 1 L.Ed.2d 511 (1957) (Jones Act case), *quoting Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957) (FELA case); *Smith v. Trans-World Drilling Co.*, 772 F.2d 157, 162 (5th Cir.1985) ("Jones Act negligence is a legally sufficient cause of injury if it played any part, no matter how small, in bringing about the injury"); *Southard*, 453 F.2d at 1118. The Fifth Circuit has described this standard of causation as "featherweight." *Smith, supra;* Gilmore and Black, The Law of Admiralty (2d ed.) at 377.

The liberal standards of negligence and legal causation fashioned by the courts in

Jones Act and FELA cases are equally applicable where testimony from medical experts fails to establish anything like a definitive answer on the question of what caused plaintiff's injury. In the leading case on this issue, *Sentilles v. Inter–Caribbean Corp.*, 361 U.S. 107, 80 S.Ct. 173, 4 L.Ed.2d 142 (1959), the Supreme Court examined the case of a seaman suing under the Jones Act. The seaman had been thrown some distance when the ship pitched in heavy seas. Shortly after the accident, he became very ill and was treated for a serious case of tuberculosis. At trial, plaintiff sought to prove that the accident activated or aggravated a previously latent tubercular condition, though no medical expert could say that the accident in fact caused plaintiff's condition. The Supreme Court affirmed the jury's finding of liability, stating:

> The jury's power to draw the inference that the aggravation of petitioner's tubercular condition, evident so shortly after the accident, was in fact caused by that accident, was not impaired by the failure of any medical witness to testify that it was in fact the cause. Neither can it be impaired by the lack of medical unanimity as to the respective likelihood of the potential causes of the aggravation, or by the fact that other potential causes of the aggravation existed and were not conclusively negated by the proofs. The matter does not turn on the use of a particular form of words by the physicians in giving their testimony. The members of the jury, not the medical witnesses, were sworn to make a legal determination of the question of causation. They were entitled to take all the circumstances, including the medical testimony, into consideration.

*Id.* at 109–10, 80 S.Ct. at 175–76 (footnote omitted). The Court also noted the general reluctance among experts to state that trauma was the cause of a disease. *Id.* at 109 n. 2, 80 S.Ct. at 175 n. 2.

The Third Circuit has just recently reiterated that the concept of causation in FELA, and thus Jones Act, cases is "broadly interpreted." *Hines v. Consolidated Rail Corp.*, 926 F.2d 262, 268 (3d Cir.1991). In reversing the lower court's grant of summary judgment in favor of the employer, the Third Circuit compared its holding in *In re Paoli Railroad Yard PCB Litigation*, 916 F.2d 829 (3d Cir.1990), *cert. denied, General Electric Co. v. Knight,* —— U.S. ——, 111 S.Ct. 1584, 113 L.Ed.2d 649 (1991), that medical experts must state their opinions with "reasonable medical certainty," to the more liberal view expressed in *Sentilles. Hines* held that "a medical expert can testify that there was more than one potential cause of a plaintiff's condition." *Id.* The court then reaffirmed the Supreme Court's holding in *Sentilles* allowing the jury to draw causal inferences based on varying and inconclusive medical testimony.

■ Looking at all the evidence presented at trial, the court finds that defendant was negligent in failing to ensure that the accommodation ladder was reasonably safe for pilot Evans' egress from the ship. Plaintiff's expert in marine surveying, William J. Campbell, stated that it is the responsibility of the officer on the ship to keep the accommodation ladder rigged properly. A properly rigged ladder would have a pin with a lanyard attached, which would be inserted at the lower platform in such a way as to lock it into position. March 4 Transcript at 69–73. The seaman's earlier fall from the platform followed by plaintiff's fall made it apparent to this court's satisfaction that the pin was not inserted properly at either point in time. In addition, the handrail on the outboard side of the ladder was defective in that a stanchion was missing, causing it to collapse when plaintiff put his weight on it. Another example of defendant's negligence is the officers' failure to respond to plaintiff's inquiry about the ladder and to investigate the situation further. It was these acts of defendant's negligence that caused Mr. Evans to fall and hit the launch.

■ As to plaintiff's orthopedic injuries, the court finds that defendant's negligent failure to rig properly the accommodation ladder caused Mr. Evans' immediate injuries: his fractured nose and bruised ribs

and coccyx. As to plaintiff's neurological injuries, the court acknowledges that it is a close and difficult question. If this were not a Jones Act case with its attendant "featherweight" standard for proving causation, then this court would find that defendant's negligence did not proximately cause or aggravate plaintiff's neurological injuries. However, this court is bound to apply the law as it now stands.

As an initial matter, the court finds that plaintiff's fall from the ladder did not cause Mr. Evans' motor neuron disease. Testimony from both Dr. Bhatt and Dr. Cook revealed that plaintiff had complained of some tiredness in his legs and balance problems before the accident. The real question is whether the fall aggravated or accelerated a pre-existing but almost completely latent motor neuron dysfunction. Testimony from the medical experts, both fully qualified in the field of neurology, indicated that there are several potential causes of the type of motor neuron disease from which Mr. Evans suffers. Plaintiff's expert, Dr. Cook, opined that the trauma of the fall "possibly" caused the aggravation of plaintiff's condition, but the etiology of the disease is still not known for certain. Dr. Duvoisin, defendant's expert, dismissed trauma as a possible cause though he did acknowledge that there are researchers in this field who claim that trauma may cause motor neuron disease. From this evidence, the court is left in a grey zone between "maybe" and "probably not." In that situation, the court is inclined to lean more heavily than it would otherwise on the circumstantial evidence in the case as well as general common sense.

The circumstantial evidence was sufficiently probative that the court feels it is reasonable to infer that the manner in which plaintiff fell from the ladder aggravated his neurological symptomology. For example, before the accident, plaintiff was not experiencing any great difficulty in his neurological functions and received no complaints of his performance on the job; one witness observed absolutely no indications of any problems as recently as seven or eight weeks before the fall. When plaintiff fell from the ladder, the full weight of

plaintiff's body struck the gunnel of the launch at the base of his spine; in addition, plaintiff struck his face on the ladder with such force as to break his nose. Mr. Evans was obviously traumatized by the event— the pilot of the launch said he looked visibly shaken and pale. Significantly, plaintiff and his wife noticed a distinct change in his ability to speak and walk just one or two days after the accident. Numerous complaints about plaintiff's ability to speak and walk on the job just six weeks after the accident are telling evidence that plaintiff's condition deteriorated substantially in a very short span of time. From all this evidence, plus the fact that medical science has not reached a point where it can rule trauma out as a possible cause of motor neuron disease, the court concludes that defendant's negligence played a part in aggravating plaintiff's neurological condition.

### C. *Damages*

The general rule for measuring damages due to the tortious conduct by a seaman's employer was set forth by this Circuit in *Downie v. United States Line Co.,* 359 F.2d 344, 347–48 (3d Cir.) (in banc), *cert. denied,* 385 U.S. 897, 87 S.Ct. 201, 17 L.Ed.2d 130 (1966), and reiterated in *Pfeifer v. Jones & Laughlin Steel Corp.,* 678 F.2d 453 (3d Cir.1982). There, the court said the plaintiff is entitled to an award of damages commensurate with the nature and extent of his injuries.

> He is entitled to reimbursement for his loss of earnings, past and prospective; for any impairment of his earning capacity; for medical expenses incurred and to be incurred; and for any other economic loss he may have sustained or is likely to sustain. He is also entitled to redress for his physical injury, including the effects thereof, such as pain, suffering, mental anguish, discomfort, and inconvenience. If the injuries are permanent ... he may recover ... his probable loss of future earnings.... The injured worker is also entitled to compensation, again based on life expectancy at the time of the injury, for the physical and mental effects of the injury on his ability

to engage in those activities which normally contribute to the enjoyment of life....

*Pfeifer,* 678 F.2d at 460.

■ In cases like this one, in which an employer's negligence aggravated a pre-existing condition, courts have held that the defendant must compensate plaintiff only for the aggravation itself and not for the pre-existing condition. "The court has only allowed damages for the increased and augmented suffering and disability which was the proximate result of defendant's act." *Scarberry v. Ohio River Co.,* 217 F.Supp. 189, 193 (S.D.W.Va.1963); *Thompson v. Coastal Oil Co.,* 119 F.Supp. 838, 845 (D.N.J.1954) (symptoms of brain damage considered only to the extent that unseaworthy condition aggravated them), *rev'd on other gds.,* 221 F.2d 559 (3d Cir. 1955), *rev'd,* 352 U.S. 862, 77 S.Ct. 90, 1 L.Ed.2d 73 (1956); Benedict on Admiralty § 32 at 3–284, 3–285 (1989). *Contra Milos v. Sea–Land Serv., Inc.,* 478 F.Supp. 1019 (S.D.N.Y.1979); *Pedersen v. Diesel Tankers, Ira S. Bushey, Inc.,* 280 F.Supp. 421 (S.D.N.Y.1967). Where plaintiff would have experienced the symptoms of his pre-existing condition at some time in the future even if he had not fallen, he can only recover that portion of his damages caused by the aggravating event, and not all damages associated with the pre-existing condition.

■ After a close review of the record at trial, the court is unable to make an award of damages that would not be completely speculative. The evidence on medical costs, for example, other than for plaintiff's orthopedic injuries, posited recovery of the entire amount necessary until Mr. Evans' death—approximately four years of acute therapy, at-home nursing care and home modifications calculated at over $1.8 million. Another problem is that plaintiff's medical experts did not say precisely how his condition was aggravated by the fall, making it impossible for the court to exercise its own judgment about the appropriate measure of the aggravation. Specifically, the court would want to know approximately when the disease would have rendered plaintiff unable to function normally but for the fall.

So that it may exercise its function properly, the court has determined that it is necessary to open the record so that evidence may be heard on how to measure damages for the aggravation of Mr. Evans' condition. The court is not interested in a repeat of what has already been offered in evidence. Rather, it expects a sufficiently detailed estimate of the increase in plaintiff's suffering, disability and wage loss due to the aggravation of his disease. The parties are hereby directed to submit briefs on this issue, based on admissible evidence. Submissions shall be delivered to chambers no later than Friday, August 23. If settlement does not occur, and if a hearing is necessary, the court will schedule one accordingly.

## ORDER

This admiralty suit having come before the court on a bench trial conducted on March 4–7, 1991; and

The court having considered all the submissions of the parties and the evidence introduced at trial, and for the reasons set forth in its Findings of Facts and Conclusions of Law entered this same date; and

For good cause shown;

IT IS this 30th day of July, 1991 hereby

ORDERED that defendant United Arab Shipping Company is adjudged liable for the negligent conduct of its employees aboard the M/V AL WATTYAH on September 10, 1989 that caused plaintiff's injuries. It is further

ORDERED that the court shall open the record to consider evidence on how to measure the damages for the aggravation of plaintiff's pre-existing neurological condition. Briefs shall be filed with the court no later than Friday, August 23 in accordance with the court's opinion of this date. A hearing, if necessary, will be scheduled accordingly.