William W. EVANS, Appellant
at Nos. 92–5300 & 92–5534,

v.

UNITED ARAB SHIPPING COMPANY
S.A.G.; M/V AL WATTYAH, her
engines, boilers, equipment, etc.

United Arab Shipping Company
S.A.G., Appellant at Nos.
92–5301 & 92–5535

Nos. 92–5300, 92–5301, 92–5534 & 92–5535.

United States Court of Appeals,
Third Circuit.

Argued Feb. 22, 1993.

Decided Aug. 13, 1993.

Sur Petition for Rehearing Sept. 22, 1993.

---

Jeffrey S. Moller, Clark, Ladner, Fortenbaugh & Young, Philadelphia, PA, and Edward V. Cattell, Jr., (argued), Clark, Ladner, Fortenbaugh & Young, Cherry Hill, NJ, for William W. Evans.

Cary R. Wiener (argued), Saburabi N. Ibrahim, Kirlin, Campbell & Keating, New York City, for United Arab Shipping Co. S.A.G.

Before: HUTCHINSON, NYGAARD and SEITZ, Circuit Judges.

## OPINION OF THE COURT

HUTCHINSON, Circuit Judge.

Appellant/cross–appellee, William W. Evans ("Evans"), a compulsory river pilot, brought this action in the United States District Court for the District of New Jersey pursuant to general admiralty and maritime law and the Jones Act ("the Act"), 46 U.S.C.A. app. § 688 (West Supp.1993).[1] He sought recovery for personal injuries allegedly sustained as a result of the negligence of the appellee/cross-appellant, United Arab Shipping Company ("UASC" or "shipowner"), as well as the unseaworthiness of UASC's vessel. The district court held that Evans was covered by the Jones Act because a compulsory river pilot qualifies as a "seaman"; furthermore, it held that Evans was employed by the vessel at the time of his injury as the Act requires. Because Evans was unable to show the extent to which his accident aggravated a preexisting neurological condition, however, the district court refused to award him any damages for aggravation of this condition.

At our Docket No. 92–5301, UASC cross-appeals the district court's order holding that Evans is a "seaman" entitled to protection under the Jones Act. According to UASC, Evans lacks the requisite employment relationship with the shipowner as well as the permanent attachment to the vessel that it says is required for seaman status under the Act. As a prerequisite to recovery under the

---

1. Evans did not specifically plead a Jones Act claim in his complaint; however, without objection, the district court recognized it as such based on the theories on which his case was

Act, a plaintiff must establish that the injury occurred within the scope of employment. Evans did not establish that he was an employee of UASC within the meaning of the Act and was instead an independent contractor. A shipowner does not have the right to control the actions of a compulsory river pilot or the right to hire or fire that pilot under applicable Delaware law. We hold, therefore, that Evans is not entitled to recover against UASC under the Jones Act because he was not an employee of UASC acting within the course of his employment when he was injured. This disposition makes it unnecessary for us to reach the issue of whether a compulsory river pilot must have a permanent attachment to a particular vessel to claim Jones Act protection.[2] Nevertheless, we will affirm the judgment for Evans, but on different reasoning than that used by the district court.

■ The district court has already determined that Evans has not established a legal or proximate cause between the shipowner's acts and aggravation of Evans's preexisting neurological disease under traditional causation principles and, instead, based its conclusion on the Jones Act's "featherweight" standard of causation. *Evans v. United Arab Shipping Co.*, 767 F.Supp. 1284, 1293 (D.N.J. 1991) (*Evans I*). The Jones Act's featherweight standard, in common with most workers' compensation statutes, extends common law definitions of legal cause to include precipitation as well as aggravation. Without the Act's recognition of this broader rippling effect, the medical evidence Evans presented is insufficient to show that his accident while descending the ship's ladder aggravated his preexisting, but largely asymptomatic, neuro-

logical disease. Absent the Act's extension of traditional views on the limits of legal or proximate cause, we agree with the district court's conclusion that this essential element to recovery for aggravation of Evans's neurological disease is lacking. A remand to the district court for a determination of whether Evans can recover under general admiralty and maritime law for aggravation of his neurological condition, therefore, is likewise unnecessary. UASC has conceded liability for Evans's orthopedic injury. Accordingly, we will affirm the district court's order entering judgment for Evans in the amount of $23,630.00 for the orthopedic injuries he suffered, lost wages and pain and suffering and will do so. *See Evans v. United Arab Shipping Co.*, 790 F.Supp. 516, 520 (D.N.J.1992) (*Evans II*).

I.

Evans was a compulsory river pilot licensed by the United States Coast Guard and the State of Delaware for over forty years.[3] As a pilot, Evans was hired to steer ships through the Delaware River and Bay and the Chesapeake and Delaware Canal. During all times material to this action, Evans was a member of the Pilot's Association for the Bay and River Delaware ("the Association"). He paid federal income taxes from 1986–89 as a self-employed taxpayer.

UASC is jointly owned by the governments of Saudi Arabia, Kuwait, Iraq, United Arab Emirates, Bahrain and Qatar. It owns and operates the container vessel M/V AL WATTYAH. On the night of September 9–10, 1989, Evans was on call at the Lewes, Delaware pilot station and was called to pilot

---

presented throughout the bench trial. *See infra* at n. 5.

**2.** UASC also argues, in the alternative, that even if Evans is covered by the Jones Act, he has not met his burden of proving that UASC aggravated his preexisting neurological condition. At our Docket No. 92–5300, Evans alleges that the district court erred in: (1) placing the burden of establishing the amount of damages representing aggravation of his preexisting neurological disease caused by UASC's negligence upon him; and (2) determining that he did not meet this burden and therefore awarding no damages for aggravation of his pre-existing neurological con-

dition. Because of our conclusion on UASC's cross-appeal that Evans cannot maintain a Jones Act action, these issues are also avoided.

**3.** Pursuant to 46 U.S.C.A. § 8501 (West Supp. 1993, Partial Revision) (delegating to the states the continued regulation of pilotage), Delaware requires all vessels entering the Delaware Bay to take a state licensed pilot aboard or be subject to penalties and fines. *See* Del.Code Ann. tit. 23, § 121 (1987). The statute also recognizes that the vessel may have to carry the pilot to sea if he cannot be removed from the vessel at the outer edge of the pilotage ground with safety. *See id.* § 132 (1987) (compelling compensation for pilot carried to sea).

the M/V AL WATTYAH toward the Chesapeake and Delaware Canal as far as Chesapeake City, Maryland where a Maryland pilot was to take over the helm. A pilot launch took Evans to the ship, which he boarded by a rope ladder with wooden rungs, known as a pilot ladder or "Jacob's ladder." Evans had difficulty in boarding from this ladder because it was in poor condition but climbed aboard the vessel without incident. He then piloted the ship to the Maryland border. As the vessel approached the point where the Maryland pilot was to board, Evans asked the master to rig the starboard side accommodation ladder so that he could disembark without using the poorly maintained Jacob's ladder that had made boarding difficult. The accommodation ladder was a staircase built of galvanized steel or aluminum, attached at its top to the main deck of the vessel, from which it was lowered to within a few feet of the water's surface. At its lower end there was an attached adjustable platform that could be fixed in position parallel to the water.

At trial, the parties did not dispute the circumstances of the accident. The pilot launch arrived at the vessel with the Maryland pilot on board. He stepped from the launch onto the lowest rung of the accommodation ladder without ever setting foot on the lower platform. A few minutes later, a seaman from the M/V AL WATTYAH started down the accommodation ladder to deliver Evans's briefcase to the launch and to assist Evans in leaving the vessel. As the seaman stepped onto the lower platform, it pivoted and dropped. The seaman fell but suffered no injury. After seeing the seaman examine the platform, Evans inquired whether it was safe to use the accommodation ladder. Evans understood the seaman's response to mean that the ladder was safe and he proceeded to descend. When he reached the lowest rung, he stepped onto the platform. It pivoted on its axle and dropped out from under him. He shifted his weight to the handrail. The handrail collapsed and he fell and struck the deck of the launch with his tailbone. In the fall Evans's face and left rib cage hit the outboard channel of the accommodation ladder. Shaken, Evans succeeded in climbing aboard the launch with the assistance of another seaman. *See Evans I*, 767 F.Supp. at 1285–87.

Evans brought this action against UASC as the shipowner and the M/V AL WATTYAH *in rem*, seeking damages under general admiralty and maritime law for orthopedic and neurological injuries suffered while disembarking from UASC's vessel. Evans pleaded a negligence and unseaworthiness theory against UASC and the vessel. He did not specifically plead a Jones Act claim in his complaint; however, he raised that theory in the district court and tried his case on it without timely objection. *See infra* n. 5. In his complaint, Evans alleged that he suffered orthopedic injuries which included a fractured nose, fractured ribs and a fractured coccyx. X-rays revealed that he did, in fact, suffer a fractured nose, but he produced no evidence to show any other orthopedic injury.

According to Evans, within one or two days of the accident, he and his wife noticed for the first time a slurring of his speech and a weakness and lack of balance in his walking. There has been a steady deterioration in his ability to speak or walk ever since the accident. His worsening condition has led to several serious falls since the accident. One, in February 1990, resulted in a fractured wrist, and in May 1990 another led to a fractured hip. Evans has been treated by several neurologists since the accident. Sadly, as it turns out, Evans continues to suffer from a serious neurological disease which causes progressive deterioration of his motor functions. He is now unable to swallow because bulbar paralysis affects his tongue and, at the time of trial, could expect soon to be bound to a wheelchair. Because of his deteriorating condition, he has not piloted a vessel since November 10, 1989, and in June 1990 he was unable to pass the annual physical exam required to renew his state pilot's license.

Evans presented evidence that he was healthy before the September 1989 accident. In July 1989 in France, he had successfully completed a week long course in ship handling that is required of all Delaware Bay and River pilots. A fellow pilot who took the course with him did not notice any neurologi-

cal or physical impairment. The evidence given at trial on Evans's good health before the accident is, however, conflicting. Dr. Bhatt, one of Evans's treating neurologists, testified that he complained of difficulty walking and with balance "for the last few months" at an examination on October 4, 1989. Joint Appendix (Jt.App.) at 79–80. Dr. Cook, another of Evans's treating neurologists, similarly noted on January 16, 1990, that "prefall," *i.e.* before the September 10, 1989, accident, Evans had complained that his legs were tired and his balance was off. Dr. Cook testified that at the time of the accident, Evans had not been diagnosed as having any motor neuron disease but that the condition probably existed in a dormant state.

Because of medical science's uncertainty in the face of neurological disorders similar to Evans's illness, no doctor has been able to provide a firm diagnosis of his neurological condition. Dr. Cook described Evans's illness as an unusual genus of motor neuron disease resembling amyotrophic lateral sclerosis ("ALS"). According to Dr. Cook, absent this accident, Evans's prognosis would have been unclear but he may never otherwise have experienced the disabling symptoms which now affect him.

Dr. Duvoisin, UASC's medical expert, after performing a neurological examination of Evans and reviewing his medical records, diagnosed Evans's condition as olivopontocerebellar atrophy ("OPCA"), a condition with nerve degeneration that resembles ALS but otherwise also generally presents symptoms like those of Parkinson's disease. Dr. Cook testified that medical science does not know what causes ALS or any other motor neuron disease; but some controlled case studies reported in the medical literature indicate that trauma could be a causative factor of the disease or at least bring out the dormant symptomatology. Dr. Cook could not, however, testify with a reasonable degree of medical certainty that the trauma of the accident most likely precipitated an otherwise latent problem; he could state only that it

was "entirely possible" and that he "relat[ed] the onset of Evans's motor neuron disease ... to the fall he suffered on September 10, 1989." Jt.App. at 115, 116. Dr. Duvoisin, on the other hand, attempted to rule out trauma as a causal factor in Evans's neurological disease. He opined that there was probably a genetic link to the disease. He conceded, however, that he could not completely rule out trauma as a causative factor "one million percent" but considered it extremely improbable and "philosophically meaningless."[4] Jt. App. at 96–97. Medical articles reporting cases that could support the trauma theory were identified by the experts at trial but not introduced as affirmative evidence on Evans's behalf.

On July 30, 1991, after considering all of the evidence, the district court issued an interim opinion and order holding that Evans was a "seaman" under the Jones Act. *Evans I*, 767 F.Supp. at 1288–91. It further determined that Evans sustained personal injuries as a result of the negligence of the shipowner because the crew of the vessel had negligently rigged the platform and handrail of the accommodation ladder. *Id.* at 1292. It found that the handrail on the outboard side of the ladder was defective because a stanchion was missing, causing it to collapse when Evans leaned on it, *id.*, and that a motor neuron disease resembling ALS permanently disabled Evans. The court then found that the motor neuron disease preexisted the fall but had been relatively asymptomatic and almost completely latent before the fall, and therefore the shipowner's negligence aggravated it. *Id.* at 1293.

The district court also found legal cause with respect to the orthopedic injuries, *id.* at 1292–93, but after considering the evidence, found that Evans missed only thirty-eight days of work, from September 11, 1989, until October 26, 1989, as a direct result of the accident. *Id.* at 1287. With respect to the aggravation of Evans's neurological disease, the court concluded "[i]f this were not a Jones Act case with its attendant 'featherweight' standard for proving causation, then

---

4. We note that a physician's view of causation is not that of a judge or lawyer who thinks of causation not only in terms of etiology but also in terms of aggravation or, in the workers' compensation context, precipitation.

this court would find that defendant's negligence did not proximately cause or aggravate plaintiff's neurological injuries." *Id.* at 1293. Under the featherweight standard of causation, the district court believed the circumstantial evidence was sufficient to permit an inference that Evans's fall from the ladder aggravated his neurological symptomatology. *Id.* Nevertheless, the district court was unable, without engaging in speculation, to separate the injury and damages attributable to the aggravation of Evans's neurological disease from those the disease would have caused in any event. *Id.* at 1294. Therefore, it ordered the record reopened for receipt and consideration of evidence on segregation of the damages attributable to the accident's aggravation of Evans's neurological disease from those caused by the underlying disease in its normal course. *Id.*

On November 22, 1991, the district court issued an order placing on Evans the burden of establishing the damages separately attributable to the shipowner's tortious aggravation of his latent motor neuron dysfunction because he was in the best position to do so. On February 6, 1992, the district court denied Evans's motion for reconsideration of its ruling on the burden of segregating damages. On March 17, 1992, the district court also denied UASC's motion for reconsideration of its determination that Evans was a Jones Act seaman.

In its final order and opinion, dated May 1, 1992, the district court entered judgment in favor of Evans on his Jones Act claim; however, the court held that Evans failed to produce evidence sufficient to establish the extent to which his preexisting neurological condition was aggravated by the shipowner's negligence. *Evans II,* 790 F.Supp. at 518–20. The district court therefore awarded Evans damages only for his fractured nose plus lost earnings of $15,155.00 for thirty-eight days, medical expenses of $875.00 for treatment of the fractured nose, and $7,600.00 for pain, suffering, and loss of enjoyment for his nose injury together with prejudgment interest. *Id.* at 520. Evans filed a timely notice of appeal on May 29,

1992. UASC filed a cross-appeal on June 4, 1992.

## II.

The district court had subject matter jurisdiction over this admiralty action under 28 U.S.C.A. § 1333 (West 1966) and the Foreign Sovereign Immunities Act, 28 U.S.C.A. § 1330 (West Supp.1993). We have appellate jurisdiction over the final order of the district court pursuant to 28 U.S.C.A. § 1291 (West Supp.1993).

Construction of the statutory term "seaman" is a question of law. *McDermott Int'l, Inc. v. Wilander,* 498 U.S. 337, 356, 111 S.Ct. 807, 818, 112 L.Ed.2d 866 (1991). Thus we exercise plenary review over the district court's interpretation of the term "seaman" under the Act. Whether Evans ultimately qualifies as a "seaman" under the Act is a mixed question of law and fact. *Id.* This Court's cases leave things somewhat unclear about the scope of review over a district court's conclusion concerning a worker's status as an employee. In a Jones Act case, *Matute v. Lloyd Bermuda Lines, Ltd.,* 931 F.2d 231 (3d Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 329, 116 L.Ed.2d 270 (1991), we stated, "The existence of an employer-employee relationship is a question of fact...." *Id.* at 236. In a later case involving the Fair Labor Standards Act, *Martin v. Selker Brothers, Inc.,* 949 F.2d 1286 (3d Cir. 1991), we opined, "The employment status of the [employees] is a legal conclusion. Thus, our standard of review ... is plenary." *Id.* at 1292 (citation omitted). We think these cases indicate that employer-employee status is sometimes, as here, a mixed question of law and fact. Accordingly, in this case we will exercise plenary review over the district court's selection of the standard by which employment status is judged, but overturn its subsidiary factual findings only if they are clearly erroneous. *See* Fed.R.Civ.P. 52(a). Once the underlying facts are established, and the rule of law is undisputed, the issue of whether the facts meet the statutory standard is an issue of law. *McDermott,* 498 U.S. at 355–56, 111 S.Ct. at 818.

## III.

### *Jones Act Claim* [5]

■ Congress passed the Jones Act in 1920 to overrule the United States Supreme Court's decision in *The Osceola*, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903). *See McDermott*, 498 U.S. at 341–42, 111 S.Ct. at 810–11. *The Osceola* held that seamen had a general maritime right to maintenance and cure and wages, as well as a right to recover for unseaworthiness, but were excluded from the general maritime negligence remedy against the shipowner. *See id.* 498 U.S. at 342, 111 S.Ct. at 810 (citing *The Osceola*, 189 U.S. at 175, 23 S.Ct. at 487); *see also* Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty* 328–29 (2d ed. 1975) ("The only purpose of the Jones Act was to remove the bar created by The Osceola, so that seamen would have the same rights to recover for negligence as other tort victims."). Because the Jones Act created new rights for "seamen," it should be liberally construed to accomplish its beneficent purposes. *See Cosmopolitan Shipping Co. v. McAllister*, 337 U.S. 783, 790, 69 S.Ct. 1317, 1321, 93 L.Ed. 1692 (1949).

The Jones Act provides, in pertinent part: Any *seaman* who shall suffer personal injury *in the course of his employment* may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such actions all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply....

46 U.S.C.A. app. § 688(a) (emphasis added). The Jones Act does not define the terms "seaman"[6] or "in the course of his employment." We have, on prior occasions, considered the scope of the term "seaman" but never in the context of a compulsory pilot. *See Mach v. Pennsylvania R.R. Co.*, 317 F.2d 761 (3d Cir.1963); *see also Griffith v. Wheeling Pittsburgh Steel Corp.*, 521 F.2d 31 (3d Cir.1975), *cert. denied*, 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976). Case law that had developed on the definition of seaman before the Supreme Court's decision in *McDermott* required a permanent connection to a particular vessel, both generally and specifically, with respect to traditional compulsory pilots. *See, e.g., Bach v. Trident S.S. Co.*, 920 F.2d 322, 324–25 (5th Cir.), *vacated and remanded*, —— U.S. ——, 111 S.Ct. 2253, 114 L.Ed.2d 706 *reaff'd on remand*, 947 F.2d 1290 (5th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1996, 118 L.Ed.2d 592 (1992); *Clark v. Solomon Nav. Ltd.*, 631 F.Supp. 1275, 1279 (S.D.N.Y.1986). Following *McDermott*, the Court of Appeals for the Fifth Circuit held, over a vigorous dissent, the permanent connection requirement as ap-

---

**5.** UASC alleges that Evans's Jones Act claim is barred because he failed to plead Jones Act status in his complaint. The Jones Act claim was, however, raised and argued fully at the bench trial. Federal Rule of Civil Procedure 15(b) provides when issues not raised by the pleadings are tried by implied consent of the parties, they shall be treated as if they had been raised in the pleadings. Amendments are to be freely granted upon motion even after judgment unless the opposing party can show prejudice. Fed.R.Civ.P. 15(b). In this case, Evans did not move to amend the pleadings. Failure to move to amend the pleadings to conform to the evidence does not affect the result of the trial.

Evans asserts that the Jones Act claim was argued without objection from UASC and therefore any objection has been waived. *See Altman v. Altman*, 653 F.2d 755, 758 (3d Cir.1981) (issue not raised in district court will not be heard on appeal absent exceptional circumstances). UASC claims that it objected to Evans's Jones Act status in a letter-memorandum to the district judge dated March 24, 1992. There is no evidence of this letter in the district court docket

sheet or the record before us. We are thus unable to consider it. In any event, this letter was allegedly submitted to the district court after conclusion of the bench trial on March 7, 1991, after the district court issued its interim opinion and order holding that Evans was a "seaman" under the Jones Act on July 30, 1991, and after the district court denied UASC's motion to reconsider its Jones Act status determination on March 17, 1992. Therefore, UASC failed to preserve this procedural issue for appeal.

**6.** Statutory definitions of "seaman" appear only in an unrelated merchant seamen's protection and relief provision and a provision dealing with maritime commercial instruments and liens. The merchant seaman provision states: " 'seaman' means an individual (except scientific personnel, a sailing school instructor, or a sailing school student) engaged or employed in any capacity on board a vessel." 46 U.S.C.A. § 10101 (West Supp.1993, Partial Revision). The maritime lien provision states: " 'seaman' means a master or a crewmember of a vessel in operation." 46 U.S.C.A. § 30101(5) (West Supp.1993 Partial Revision).

plied to compulsory pilots survived *McDermott. See Bach*, 947 F.2d at 1291. This Court's case law is not entirely clear on how the permanent connection factor applies to persons who perform the core functions of a seaman on a vessel in navigation.[7] Because we conclude a compulsory river pilot such as Evans is not an employee of the vessel he pilots, he would be unable to recover under the Jones Act even if he is a seaman. Accordingly, we do not decide whether the requirement of permanent attachment survives *McDermott* with respect to Jones Act coverage of persons who, like compulsory pilots, perform core navigational functions on a traditional vessel plying the seas or waterways in the traditional way of trading vessels, as opposed to the various kinds of recently developed more or less fixed offshore platforms in whose context the permanent attachment requirement was largely developed. *See Bach*, 920 F.2d at 333 (Brown, J., dissenting).[8]

■ The Jones Act provides a remedy for "any seaman who shall suffer personal injury *in the course of his employment....*" 46 U.S.C.A. app. § 688(a) (emphasis added).[9] Thus, as a prerequisite to recovery under the

Act, the plaintiff must establish an employment relationship with the defendant. *Matute*, 931 F.2d at 235–36 ("The Jones Act provides seamen a suit for damages against employers for injuries incurred while at sea, and the plaintiff must establish an employment relationship to recover under the Act."); *Simko v. C & C Marine Maint. Co.*, 594 F.2d 960, 963 n. 2 (3d Cir.), *cert. denied*, 444 U.S. 833, 100 S.Ct. 64, 62 L.Ed.2d 42 (1979); *see also Cosmopolitan Shipping*, 337 U.S. at 790–91, 69 S.Ct. at 1321–22; *Haskins v. Point Towing Co.*, 421 F.2d 532, 536 (3d Cir.) ("Rights given under the Act are an outgrowth of the peculiar condition of a seaman's employment."), *cert. denied*, 400 U.S. 834, 91 S.Ct. 68, 27 L.Ed.2d 66 (1970); *McAleer v. Smith*, 818 F.Supp. 486, 492 (D.R.I. 1993). In this respect, the Act is the maritime equivalent of the Federal Employers' Liability Act ("FELA") covering railroad employees. *See* 46 U.S.C.A. § 688.

The district court did not engage in any detailed analysis of the employment question, instead holding that "on the morning of September 10, 1989, [Evans] was acting [as a river pilot] aboard the M/V AL WATTYAH

---

7. In *Griffith*, we set forth three factors to determine whether a land based barge loader was covered under the Longshoremen's and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C.A. §§ 901–950 (West 1986 & Supp.1993) or under the Jones Act as a seaman. We required that (1) the ship be in navigation; (2) there ·be a more or less permanent connection with the ship; and (3) the worker be aboard primarily to aid in navigation. *Griffith*, 521 F.2d at 36 (quoting M. Norris, *The Law of Seamen* § 668 at 301 (3d ed. 1970)). In our previous decision in *Mach*, we had held that a bargeman who was permanently employed at a railroad dock and who was injured while moving a barge into position for unloading at the dock was a "seaman" under the Act. *Mach*, 317 F.2d at 764. *Mach* did not mention who owned the barges. *Griffith* distinguished *Mach* on the basis that the bargeman in *Mach* was *permanently* assigned to work at the river landing for the defendant railroad where a substantial amount of his work occurred on barges and involved navigational functions. *Griffith*, 521 F.2d at 38. *Mach*, the earlier case, could be controlling. It did not require permanent attachment to a particular vessel for Jones Act seaman status, but only a job in which a substantial portion of the employee's duties were performed in the navigation of a vessel. *Id.*

8. We note that other courts, including, by implication, the United States Supreme Court, continued to recognize the continuing vitality of the permanent attachment requirement after *McDermott. See, e.g., Southwest Marine, Inc. v. Gizoni*, —— U.S. ——, 112 S.Ct. 486, 494, 116 L.Ed.2d 405 (1991); *McKinley v. All Alaskan Seafoods, Inc.*, 980 F.2d 567, 569 (9th Cir.1992); *Bach*, 947 F.2d at 1291; *Harwood v. Partredereit AF 15.5.81*, 944 F.2d 1187, 1192 (4th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1265, 117 L.Ed.2d 493 (1992). Most of the courts that have specifically considered the test's applicability to compulsory pilots have likewise concluded that a compulsory pilot is not a seaman under the Act because he lacks permanent attachment to an identifiable vessel or fleet of vessels. *See, e.g., Bach*, 947 F.2d at 1291; *Harwood*, 944 F.2d at 1192; *Stoller v. Evergreen Int'l (U.S.A.) Corp.*, No. C92–0466 FMS, 1992 WL 457541 (N.D.Cal. Sept. 1, 1992); *Ray v. Great Lakes Towing Co.*, No. 3:92CV7034 (N.D. Ohio Feb. 25, 1992) (mem.); *Clark*, 631 F.Supp. at 1279. *But see Bach*, 920 F.2d at 331–33 (Brown, J., dissenting) (persuasively setting forth contrary and logical position).

9. Neither the legislative history of the Jones Act nor that of the LHWCA defines the phrase "in the course of his employment."

when the accident occurred. The ship's owner employed Mr. Evans through the services of the Pilot's Association.... Therefore, he had that 'employment-related connection' essential to determining seaman status." *Evans I*, 767 F.Supp. at 1291 (quoting *McDermott*, 498 U.S. at 355, 111 S.Ct. at 817). Although making this limited finding with respect to the employment element, the district court did not explicitly determine whether Evans was an employee of UASC and injured "in the course of his employment," a prerequisite for Jones Act liability. Instead, it stated that Evans's work contributed to the mission of the ship and required him to confront the hazards of the sea faced by other members of the ship's crew and summarily concluded, "Mr. Evans, therefore, is entitled to the protection of the Jones Act." *Id.* In doing so, the district court appeared to confuse the in navigation prong of the seaman test with the additional requirement that a seaman be injured in the course of his employment. We believe it is necessary to determine separately whether the requisite employment relationship exists between UASC and Evans.

■ In determining Evans's employment status, we think it is proper to apply ordinary principles of the law of agency adjusted by an eye on the peculiarities of maritime life. Traditional agency law looks mainly to the degree of control the principal exercises over the agent. *See* Restatement (Second) of Agency § 220(1) (1958) ("A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control."). We have noted that factors indicating control include payment, direction, supervision and the power to hire or fire. *See Matute*, 931 F.2d at 236. Other factors include the power to determine the route of the ship and the activities of the crew. *See Cosmopolitan Shipping*, 337 U.S. at 795, 69 S.Ct. at 1324.

■ The relation of master and servant may exist although the law requires the selection of a worker from a limited class, and the master is liable for torts servants so selected commit within the scope of employment. Restatement (Second) of Agency § 223. With respect to compulsory pilots, a comment to the Restatement specifically provides:

> c. *Compulsory pilots.* Under statutes requiring shipowners to accept the services of licensed pilots other than persons already in the shipowner's employ upon entering or leaving port, *the shipowner is not liable for the negligence of the pilot in the navigation of the ship, if the effect of the pilotage statutes is to remove control over the navigation of the ship from the shipowner and place it entirely in the pilot. In such case, the relation of master and servant does not exist between such owner and the pilot....*

*Id.* § 223 cmt. c. (second emphasis added). We must consider, therefore, the pilotage statute which governs the relationship between Evans and UASC to determine the extent to which it gives control of the ship to the pilot.

The relevant Delaware statute provides for the licensing, training and discipline of pilots. *See generally* Del.Code Ann. tit. 23, §§ 103–137 (1987 & Supp.1992). It also provides that all ships entering Delaware ports must take a compulsory pilot on board or face a lawsuit by the pilot who offered the services for full pilotage rates either *in personam* or *in rem* through a lien on the vessel.[10] The statute does not address the degree of con-

---

10. The statute provides, in relevant part:

Every foreign ship or vessel and every ship or vessel engaged in foreign commerce or trade arriving from or bound to any foreign port or place, passing in or out of the entrance to Delaware Bay, and passing between the points of land known as the Capes of the Delaware, shall be obliged to receive a pilot.... If the master of any ships or vessels, after she is spoken or a pilot offered, refuses or neglects to take a pilot, the master, owner or consignee of such vessel shall forfeit and pay to any such pilot suing for the same a sum equal to the pilotage of such ship or vessel to be recovered by a suit in the courts of this State ... or such pilot may pursue his remedy therefor by a libel in admiralty in any United States court either in personam or by proceeding in rem, to enforce the lien given him on such ship or vessel, as such pilot may see fit and proper to do.

Del.Code Ann. tit. 23, § 121 (1987).

trol over the vessel that the pilot has and the master relinquishes. It is therefore of little help to our analysis.

■ UASC argues that Evans cannot bring suit against it under the Jones Act because Evans was either an independent contractor, as evidenced by his 1986–89 federal income tax filings as a self-employed taxpayer, or an employee of the Pilots' Association. Evans's tax treatment of his earnings as a pilot is relevant evidence on his employment status, but it is not determinative of the degree of control the shipowner could exercise over him.[11]

Few cases address the application of the Jones Act's employment requirement to compulsory pilots. None have held a compulsory pilot is an employee of a vessel he pilots. Instead, they have held that compulsory pilots are either employees of the pilots' association or independent contractors. *Compare Harwood*, 944 F.2d at 1189 (compulsory harbor pilot who was member of Virginia Pilots' Association held to function as independent contractor) *and Bach v. Trident Shipping Co.*, 708 F.Supp. 772, 773–74 (E.D.La.1988) (compulsory pilot held to be independent contractor), *aff'd on other grounds*, 920 F.2d 322 (5th Cir.), *vacated and remanded*, —— U.S. ——, 111 S.Ct. 2253, 114 L.Ed.2d 706, *reaff'd on other grounds*, 947 F.2d 1290 (5th Cir. 1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1996, 118 L.Ed.2d 592 (1992) *and Clark*, 631 F.Supp. at 1275 (parties agreed that compulsory river pilot who worked for his own company, a member of pilots' association, was independent contractor and not employee of shipowner in suit by pilot brought solely under general maritime law) *with Ray v. Great Lakes Towing Co.*, 92 Civ. 7034 (N.D.Ohio Feb. 25, 1992) (compulsory pilot was employee of pilots' association). *But see Guy v. Donald*, 203 U.S. 399, 407, 27 S.Ct. 63, 64–65, 51 L.Ed. 245 (1906) (in negligence action by shipowner against members of pilots' association for negligence of its compulsory pilot, association held not liable because

had no control over shipboard job performance of its members).

In the case at bar, we are persuaded that there is no employer-employee relationship between Evans and the shipowner. In *Bach*, the district court discussed *Magnolia Towing Co. v. Pace*, 378 F.2d 12, 13 (5th Cir.1967) (per curiam) which affirmed a Jones Act verdict in favor of a river pilot who had worked directly for the defendant for one year, was paid a monthly salary by the defendant and was therefore permanently assigned as pilot to one or another of the defendant's tugboats. The *Bach* court distinguished *Pace* because the pilot in *Pace* was a permanent, salaried employee of the defendant. *Bach*, 708 F.Supp. at 773. On appeal, the employer-employee relationship was not put in issue. *Bach*, 920 F.2d at 324–26. The district court in *Bach* had held that a compulsory pilot, a member of the pilots' association, was an independent contractor even though the shipowner had a right to refuse the pilot's services and incur the penalties the pilotage statute imposed, and the pilot fee was characterized as "wages." *Bach*, 708 F.Supp. at 773–74. The district court concluded that these facts were not inconsistent with a compulsory pilot's status as an independent contractor. *Id.* We agree with the district court in *Bach* that these facts are insufficient to show that a compulsory pilot is employed by the vessel piloted. *See also Bach*, 920 F.2d at 327 n. 5 (record did not show that compulsory pilot was employee of anyone).

■ The cases that concern a shipowner's liability for a pilot's negligence are instructive. Generally, shipowners are not liable for torts committed through the negligence of a compulsory pilot under the theory that the owner had no discretion to select the individual. *See The China*, 74 U.S. (7 Wall) 53, 19 L.Ed. 67 (1868). The vessel, however, may be held liable *in rem*. *See id.* Where the pilot is taken at the discretion of the shipowner, the case for a master-servant relationship is stronger and the owner may be

---

**11.** Given the nature of the tasks a compulsory pilot performs, it is difficult to conceive of any other federal taxation category into which Evans would fit. The determination of employee status depends on substance not form, and we decline to accord Evans's tax treatment controlling weight.

held to answer for the torts of the pilot. *See Homer Ramsdell Transp. Co. v. La Compagnie Generale Transatlantique*, 182 U.S. 406, 416, 21 S.Ct. 831, 835, 45 L.Ed. 1155 (1901) (quoting Story, Treatise on Agency 2d ed. § 456a); *see also* Black & Gilmore, *supra*, § 7–16 at 520 ("A pilot may be taken on voluntarily *or* under the compulsion of some local statute or regulation. The voluntary pilot is in much the same position as any other crew member.... [I]f the pilotage is 'compulsory' the *respondeat superior* nexus is broken, and the shipowner cannot be held personally liable for the fault of the pilot resulting in collision."). Even in the case of the compulsory pilot, though, the shipowner may still be liable *in personam* if found to be somehow at fault. *See Chesapeake Bay Bridge & Tunnel Dist. v. Lauritzen*, 404 F.2d 1001, 1007 (4th Cir.1968) (statutory pilot's presence does not lessen master's duty or authority and shipowner held responsible if master fails to act to correct pilot's dangerous actions); *see also City of Los Angeles v. Standard Transp. Co.*, 32 F.2d 988 (9th Cir. 1929) (safety of all aboard remains with master despite presence of municipal pilot); *Robins Dry Dock & Repair Co. v. Navigazione Libera Triestina S.A.*, 32 F.2d 209, 210 (2d Cir.) (ship captain not totally divested of authority by presence of compulsory pilot), *cert. denied*, 280 U.S. 574, 50 S.Ct. 30, 74 L.Ed. 626 (1929); *cf. The China*, 74 U.S. (7 Wall) at 67–68 (owner may countermand pilot upon discovery of pilot's incapacity or intoxication).

The Delaware statute that required UASC to take Evans on board and accept his services as a pilot is similar to the New York pilotage law the Supreme Court considered in both *Homer Ramsdell* and *The China*. *Compare* Del.Code Ann. tit. 23, §§ 117, 121–26 *with* N.Y. Navigation Law § 88 (McKinney 1992). In *Homer Ramsdell*, the Supreme Court held in the case of a compulsory pilot that neither the master nor the shipowner was liable for the negligence of the pilot under common law because the " 'pilot cannot be deemed properly the servant of the master or the owner, but is forced upon them, and the maxim, *Qui facit per aliam facit per se*,[12] does not apply.' " *Homer Ramsdell*, 182 U.S. at 416, 21 S.Ct. at 836 (footnote added) (quoting Story, Treatise on Agency 2d § 456a). Application of this maxim to the relationship between shipowner and compulsory pilot was essential to the result in that case.[13]

■ It remains material here, where UASC was also required by statute to pay a fee for Evans's compulsory services. At the completion of the voyage, the ship's master signed the pilot's "ticket" acknowledging that Evans was on board and performed services. Evans subsequently dispatched an invoice for those services to the shipowner. Evans stated in his deposition that he was a self-employed member of the Pilots' Association. As in *The China*, the master of the vessel retained the ability to countermand the pilot in exceptional circumstances and did not relinquish all right of control over the vessel to the compulsory pilot. *See Charente S.S. Co. v. United States*, 12 F.2d 412, 413 (5th Cir. 1926) (master may displace pilot in instance of manifest incompetence); *In re Hercules Carriers, Inc.*, 566 F.Supp. 962, 974, 978–79 (M.D.Fla.1983), *aff'd*, 768 F.2d 1558 (11th Cir.1985). But the master has no discretion in selecting or firing a pilot or taking control from him absent an extraordinary situation. The compulsory pilot is in supreme command of the vessel while he is navigating it. Only

---

**12.** The Latin means, "He who acts through another acts himself." Black's Law Dictionary 1124 (5th ed. 1979).

**13.** The United States District Court for the Eastern District of New York, in a single case, has held that where, under the same New York statute, the vessel could elect to engage a pilot or to have the ship piloted by its master and pay the pilotage, the pilot engaged by the vessel was an "employee" within the Jones Act with regard to liability for the pilot's death, and *Homer Ramsdell* was not controlling because it presented a situation where a third party was attempting to sue the shipowner for the pilot's negligence. *Peterson v. United New York Sandy Hook Pilots' Ass'n*, 6 F.Supp. 649 (E.D.N.Y.1934). That case has not been overruled but it also has never been cited and seems directly contrary to the decision in *Homer Ramsdell*. Moreover, the Delaware pilotage statute states that ships entering state waters "shall be obliged to receive a pilot." Del. Code Ann. tit. 23, § 121. No alternative is present and non-compliance requires a forfeiture of the pilot fee. *See id.*

if he displays gross negligence does the master have the authority to remove a compulsory pilot from the helm or to countermand the pilot's orders and the master, if he does so, acts at the risk of penalty for violation of the state regulatory provision. *See The China,* 74 U.S. (7 Wall) at 67–68; *cf. Bisso v. Inland Waterways Corp.,* 349 U.S. 85, 94, 75 S.Ct. 629, 634, 99 L.Ed. 911 (1955) ("Under law and custom [pilots] have an independence wholly incompatible with the general obligations of obedience normally owed by an employee to his employer.... As a rule no employer, no person, can tell them how to perform their pilotage duties.... [P]ilots are usually free to act on their own best judgment while engaged in piloting a vessel."). While we recognize that the master of the vessel may be found negligent and have his license suspended or revoked if he fails to take action to relieve a pilot when he concludes that the pilot is taking the vessel into danger, *see The Oregon,* 158 U.S. 186, 194, 15 S.Ct. 804, 808, 39 L.Ed. 943 (1895); *Ralli v. Troop,* 157 U.S. 386, 15 S.Ct. 657, 39 L.Ed. 742 (1895); *Chesapeake Bay Bridge and Tunnel,* 404 F.2d at 1007, we think this limited control is insufficient to import an employer/employee relationship under the maxim which supplies the Supreme Court's rationale in *Homer Ramsdell.*

Because the principles enunciated in *Homer Ramsdell* are similar to those applicable to the instant case, we believe the vessel and its master, acting in accord with the Delaware statute, lack the ability to control in the degree necessary to create a master-servant relationship. This result seems to us compelled by the shipowner's lack of any choice or discretion in selecting a pilot and the extremely limited circumstances under which an owner may direct the pilot's activity on board the vessel. Though the Supreme Court has recognized in dicta that "the word 'employment' should be construed so as to give protection to seamen for torts committed against them by those standing in the proximate relation of employer, and the rules of private agency should not be rigorously applied," it also cautions us that it would be wrong to "disregard the plain and rational meaning of employment and employer to furnish a seaman a cause of action against one completely outside the broadest lines or definitions of employment or employer." *Cosmopolitan Shipping,* 337 U.S. at 790–91, 69 S.Ct. at 1321. Accordingly, we hold that Evans has failed to demonstrate the employment relationship with UASC that the Jones Act requires to support his claim.[14]

### IV.

In summary, we hold that Evans lacks the requisite employment relationship with the shipowner and is therefore not entitled to maintain a Jones Act action against it. The district court did not err in concluding Evans failed to establish causation between the shipboard accident and aggravation of his preexisting neurological condition without the benefit of the Jones Act "featherweight" standard of causation. Evans is entitled to recover for his orthopedic injuries, an award of damages conceded by the shipowner. We will therefore affirm the judgment and order of the district court awarding Evans damages only for his orthopedic injury, lost earnings, and pain and suffering resulting therefrom.

NYGAARD, Circuit Judge, dissenting.

The majority does not disturb the district court's conclusion that Evans is a Jones Act seaman, but concludes that the court erred by finding that United Arab "employed" Evans. I dissent because I conclude that the district court properly found Evans to be a seaman and employed by United Arab.

---

**14.** UASC has conceded the propriety of the orthopedic damages and, therefore, we will affirm that award. It says:

> If this court agrees that Evans is not a Jones Act seaman, then [sic] district court's finding of aggravation should be *reversed,* and the total damages awarded for his orthopedic injuries *affirmed....* Should the district court's finding as to Evans' seaman status be reversed, all other argument will be moot as the present appeals flow from the court's ruling on Jones Act status. Evans and shipowner do not raise any issue with damages for orthopedic injuries, the only damages awarded.

Brief for Appellee/Cross–Appellant UASC at 4 (emphasis in original). Thus, no remand on discussion concerning the propriety of those damages is necessary.

Thus, he is entitled to coverage under the Jones Act.

## I.

By its express terms, the Jones Act provides remedies for sea-based maritime workers and thus covers only "seamen." The Jones Act does not define "seaman." But the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 901 *et seq.*, which provides remedies for land-based maritime workers, excludes from its coverage "a master or member of a crew of any vessel." This term is a refinement of "seaman" in the Jones Act. *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 348, 111 S.Ct. 807, 813, 112 L.Ed.2d 866 (1991). "Thus, it is odd but true that the key requirement for Jones Act coverage now appears in another statute." *Id.*

Traditionally, the elements necessary to determine who is a "seaman" have been " '(a) that the ship be in navigation; (b) that there be a more or less permanent connection with the ship; and (c) that the worker be aboard primarily to aid in navigation.' " *Griffith v. Wheeling Pittsburgh Steel Corp.*, 521 F.2d 31, 36 (3d Cir.1975), quoting Martin Norris, The Law of Seaman § 668, at 301 (3d ed. 1970). The Supreme Court has since eliminated the last requirement, holding that it "is not necessary that a seaman aid in navigation or contribute to the transportation of the vessel...." *Wilander*, 498 U.S. at 355, 111 S.Ct. at 817.

Although it is undisputed that the M/V AL WATTYAH was in navigation, the parties dispute whether Evans was "more or less permanent[ly] connect[ed]" to the vessel. The majority does not resolve this issue, believing it is unclear how the "permanent connection" factor applies to a pilot, who is not permanently connected to any vessel in the temporal sense but who nonetheless performs the core navigational functions of a seaman and unquestionably is essential to the ship's mission. The confusion arises because it is difficult to define the nature of the required connection between the worker and the vessel: that is, does a "permanent connection" mean a lasting temporal relationship with the particular vessel, or something else?

In *Mach v. Pennsylvania R.R. Co.*, 317 F.2d 761 (3d Cir.1963), coal transported from barges under tow had to be loaded onto railway cars. Because the barges were not self-propelled, when a towing vessel released a barge, a bargeman hired by the railway took control of it. "In brief, all the handling and attending of barges, from the time a tow boat releases its flotilla, through the unloading, until the time when the empty barges are towed away, is done by the bargeman." *Id.* at 762–63. The issue was whether a bargeman under these circumstances was a "seaman." We held he was, reasoning:

> The work of causing a boat to move in navigable water is the most fundamental and characteristic function of a ship's crew. From the release of loaded barges from their tow until the departure of empty barges under tow, all of the ship's service which a barge required was performed by bargemen who took the place of whatever crew handled them during their journeys up and down the river.

> \* \* \* \* \* \*

> The duration of service for and upon a vessel may determine whether shipboard work which is not normally performed by a ship's company makes the worker a crewman, *but lack of long continued attachment to the vessel cannot, as a matter of law, serve to deny seaman's status under the Jones Act to an employee who is injured while assigned to and performing normal crew service.*

*Id.* at 763–64 (emphasis added).

In *Griffith v. Wheeling Pittsburgh Steel Corp.*, 521 F.2d 31 (3d Cir.1975), we held that a worker who was temporarily assigned to work on barges and whose only contact with ships amounted to fewer than four of the seventy-four days he had been employed, was not a seaman. In distinguishing *Mach,* we opined that "the bargeman in *Mach* was permanently assigned to work at the river landing where he performed a substantial amount of his work time on the barges, which duties involved significant navigational functions, and who was injured while moving a loaded barge." *Id.* at 38. Thus, under Third Circuit law the permanent connection

factor is not a temporal relationship with any particular ship, but is employment-related and focuses instead on the nature of the worker's duties as they relate to the ship and the ship's mission at the time of the injury. Our case law is consistent with traditional maritime law and the Jones Act.

The Supreme Court noted that traditional seamen's remedies have been universally recognized as growing out of " 'the special hazards and disadvantages to which they who go down to the sea in ships are subjected.' " *Wilander*, 498 U.S. at 354, 111 S.Ct. at 817, quoting *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 104, 66 S.Ct. 872, 882, 90 L.Ed. 1099 (1946) (Stone, C.J., dissenting). "All who work at sea in the service of a ship face those particular perils to which the protection of maritime law, statutory as well as decisional, is directed." *Id.* Pilots, no less and perhaps more than any other member of a crew, are subjected to the perils of the sea. See *Bach v. Trident Steamship Co., Inc.*, 920 F.2d 322, 330 (5th Cir.1991) (Brown, J., dissenting) ("Navigation in and out of ports and harbors, and within restricted waters, poses special hazards that are not presented when sailing on the high seas."). By enacting the LHWCA and the Jones Act, Congress distinguished between land-based and sea-based employment and provided remedies to those who are a "master or member of a crew," and thus facing the special dangers of the sea, and to those who are not. *Wilander*, 498 U.S. at 354–55, 111 S.Ct. at 817.

This distinction is the heart of the permanent connection factor because the "key to seaman status is employment-related connection to a vessel in navigation." *Id.* Since "a seaman must be doing the ship's work," that connection shows that the worker is " 'contribut[ing] to the function of the vessel or to the accomplishment of its mission' . . . ." *Id.*, quoting *Offshore Co. v. Robison*, 266 F.2d 769, 779 (5th Cir.1959). And, since such a job exposes the worker to the particular hazards of the sea, there is no good reason why he should not be covered by the protection of maritime law, statutory as well as decisional. See *The Arizona v. Anelich*, 298 U.S. 110, 123, 56 S.Ct. 707, 711–12, 80 L.Ed. 1075 (1936) (Jones Act protects seamen who are

wards of admiralty and so must be broadly construed to attain that end). Thus, failing to show a lasting relationship between a worker and a particular vessel does not change either the fact that one doing a ship's work faces all the special dangers of sea-based maritime employment, or that a seaman's status depends on the nature of the worker's duties as they relate to the ship. See *Pacific Merchant Shipping Ass'n v. Aubry*, 918 F.2d 1409, 1412 (9th Cir.1990) ("the term 'seaman' includes a broad range of marine workers whose work on a vessel on navigable waters contributes to the functioning of the vessel, to accomplishment of its mission, or to its operation or welfare"). See also 46 U.S.C. § 10101(3) ("seaman" means an individual "engaged or employed in any capacity on board a vessel").

No one disputes that Evans was injured in the course of successfully navigating the M/V AL WATTYAH. *Evans v. United Arab Shipping Co.*, 767 F.Supp. 1284, 1285 (D.N.J. 1991). Because he contributed to the function of the vessel and to the accomplishment of its mission, he was a seaman; and merely because he was not connected to the vessel in a long-term temporal sense cannot, as a matter of law, take away his rights under the Jones Act. *Mach*, 317 F.2d at 763–64.

## II.

A plaintiff must also show an employment connection with the defendant. *Matute v. Lloyd Bermuda Lines, Ltd.*, 931 F.2d 231, 236 (3d Cir.1991). After a bench trial, the district court specifically found that United Arab *"employed* Mr. Evans through the services of the Pilot's Association, an organization of river pilots in the area." *Evans*, 767 F.Supp. at 1291 (emphasis added). The majority believes that the court clearly erred in making this finding.

The question of whether a defendant is an employer for the purposes of the Jones Act is normally a factual one within the province of the fact-finder. *Welsh v. Utah Dredging Co.*, 403 F.2d 217 (3d Cir.1968); *Wheatley v. Gladden*, 660 F.2d 1024, 1026 (4th Cir.1981); *The Norland*, 101 F.2d 967, 973 (9th Cir. 1939). Thus, the factfinder's determination

should not be disturbed if there is a rational evidentiary basis for its conclusion.

General rules of agency may help to determine if an employment relationship exists. One must remember, however, that the Jones Act is a remedial legislation extending to seamen the rights accorded railway workers under the Federal Employers' Liability Act, 45 U.S.C. § 51 *et seq.* It benefits and protects seamen who are peculiarly the wards of admiralty, and so it must be liberally construed to attain that end. *The Arizona,* 298 U.S. at 121–22, 56 S.Ct. at 711–12, citing *Cortes v. Baltimore Insular Line, Inc.,* 287 U.S. 367, 375, 53 S.Ct. 173, 175, 77 L.Ed. 368 (1932); *Jamison v. Encarnacion,* 281 U.S. 635, 639, 50 S.Ct. 440 (1930); *Alpha S.S. Corp. v. Cain,* 281 U.S. 642, 50 S.Ct. 443, 74 L.Ed. 1086 (1930); *Warner v. Goltra,* 293 U.S. 155, 157, 55 S.Ct. 46, 47, 79 L.Ed. 254 (1934). "Congress intended that the purposes of [FELA and the Jones Act] should not be restricted by common-law concepts of control so as to bar from welfare legislation as independent contractors persons who were as a matter of economic reality a part of the processes and dependent upon the businesses to which they rendered service." *Cosmopolitan Shipping Co. v. McAllister,* 337 U.S. 783, 790, 69 S.Ct. 1317, 1321, 93 L.Ed. 1692 (1949). Thus, "the word 'employment' should be construed so as to give protection to seamen for torts committed against them by those standing in the proximate relation of employer, and the rules of private agency should not be rigorously applied." *Id.,* 337 U.S. at 790, 69 S.Ct. at 1321. Rather, courts should construe "employment" in "the broadest lines or definitions of employment or employer." *Id.*

With this in mind, I cannot agree with the majority's conclusion that the district court erred by finding that Evans was employed by United Arab. I conclude there is sufficient evidence to support this finding. It is undisputed that United Arab paid money for Evans' services. Indeed, Delaware law gives a pilot a cause of action for wages against the shipowner. Del.Stat.Ann. tit. 23 § 121 (1987). By the plain meaning of "employment," Evans was engaged in the services of United Arab.

Moreover, although control is said to be the most important factor in determining whether the plaintiff is an employee of the defendant, *United States v. W.M. Webb, Inc.,* 397 U.S. 179, 90 S.Ct. 850, 856, 25 L.Ed.2d 207 (1970), it is not significant in determining whether a pilot is an employee because "a pilot, so far as respects the navigation of the vessel in that part of the voyage which is his pilotage-ground, is *the temporary master* charged with the safety of the vessel and cargo, and of the lives of those on board, and intrusted with the command of the crew." *Cooley v. Board of Wardens,* 53 U.S. (How.) 299, 316, 13 L.Ed. 996 (1851) (emphasis added). There is no question that a master is covered under the Jones Act. *Warner v. Goltra,* 293 U.S. 155, 159–60, 55 S.Ct. 46, 48, 79 L.Ed. 254 (1934). Thus, although a master, as the agent and representative of the shipowner, controls the ship's crew, it cannot be said that the shipowner controls the master in the daily, nautical routines and functions of the ship. Nor should one expect to conclude that a pilot, who is the only person with specialized skills and knowledge necessary to navigate ships in unfamiliar waters, is controlled in his employment by the shipowner.

"The services of the pilot are as much for the benefit of the vessel and cargo as those of the captain and crew. His compensation comes from the same source as theirs. Like them he serves the owner and is paid by the owner. If there be any default on his part, the owner has the same remedies against him as against other delinquents on board. The difference between his relations and those of the master is one rather of form than substance." *The China,* 74 U.S. (7 Wall.) 53, 67, 19 L.Ed. 67 (1868).

I believe that the district court, as a trier-of-fact, did not err when it found that Evans was "employed," in either the plain or liberal sense of that term, by United Arab. Furthermore, even if, as the majority asserts, the district court "appeared to confuse the in navigation prong of seaman test [which requires an employment-related connection to the vessel] with the additional requirement" that there be an employment connection with the defendant, I would not decide the issue

as a matter of law on appeal, but would remand for the district court to consider the issue in the first instance. See *Matute,* 931 F.2d at 236 (in Jones Act cases "existence of an employer-employee relationship is a question of fact"); Martin Norris, *The Law of Seamen,* § 30:14 at 369 & nn. 70–71 (4th ed. 1985) (determination of whether an employment relationship exists is a question of fact and should be left for the trier-of-fact to decide) (collecting cases).

### III.

Because Evans is a Jones Act seaman and was employed by United Arab, he is entitled to coverage under the Jones Act. He is thus entitled to the Jones Act's "featherweight" causation standard, under which the district court concluded that United Arab's negligence aggravated his preexisting neurological condition. It is then incumbent upon United Arab, the proven tortfeasor, rather than Evans, the innocent plaintiff, to show that damages can be segregated.[1] Because the district court erroneously placed this burden on Evans, I would reverse and remand for further proceedings.

#### SUR PETITION FOR REHEARING

Sept. 22, 1993.

Present SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, ROTH, LEWIS and SEITZ,* Circuit Judges.

The petition for rehearing filed by appellant William W. Evans in the above captioned matter having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active

service not having voted for rehearing by the court in banc, the petition for rehearing is denied.

---

1. "[W]hen a plaintiff has a preexisting condition that would inevitably worsen ... the burden of proof in such cases is upon the defendant to prove the extent of the damages that the preexisting condition would inevitably have caused." *Maurer v. United States,* 668 F.2d 98 (2d Cir. 1981). See Restatement (Second) of Torts § 433B, comment d (1965) ("As between the proved tortfeasor who has clearly caused some harm, and the entirely innocent plaintiff, any hardship due to lack of evidence as to the extent of the harm caused should fall upon the former.").

